KING & KING ENTERPRISES, d/b/a King Gas & Oil; and Carl R. King, d/b/a King Gas & Oil, Plaintiffs-Appellees,

v.

CHAMPLIN PETROLEUM COMPANY, Defendant-Appellant.

No. 80–1630.

United States Court of Appeals, Tenth Circuit.

Argued March 19, 1981.

Decided Aug. 3, 1981.

Rehearing Denied Sept. 14, 1981.

Richard W. Giauque, Berman & Giauque, Salt Lake City, Utah (Gary F. Bendinger and James R. Holbrook, Berman & Giauque, Salt Lake City, Utah, with him on the brief), for plaintiffs-appellees.

Cecil E. Munn, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex. (Charles A. Zubieta, Champlin Petroleum Co., A. Camp Bonds, Bonds, Matthews, Bonds & Hayes, Muskogee, Okl., and Mark C. Hill, Fort Worth, Tex., with him on the brief), for defendant-appellant.

Before SETH, Chief Judge, and BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

King & King were plaintiffs below in a private antitrust action which arose under § 1 of the Sherman Act, 15 U.S.C. § 1, 1980. Champlin Petroleum Co. is the defendant and the appellant. The complaint alleged violations of both § 1 and § 2 of the Sherman Act. Also there is a third party action against one Fred Dea Entriken, a former Champlin employee. In this third party claim it is alleged that if Champlin was found liable in the King action that Entriken should be held responsible for the damages which Champlin is required to pay. Entriken filed a fourth party action against Mickey Bowles and Dewey Mason, two of his superiors during the time he was employed by Champlin. There he alleged that he had acted in accordance with instructions and with company policy. Prior to the trial King withdrew his claims against Champlin under § 2 of the Sherman Act for predatory and coercive pricing and refusal to deal. The trial began on April 21, 1980 on King's claim of price fixing under § 1 of the Sherman Act and the issue and amount of damages, and on the third and fourth party claims. The jury found in favor of King on the price fixing claim against Champlin and in favor of Entriken on the third party action. Champlin appeals herein from the judgment against it on the price fixing claim. It does not appeal the judgment on the third party action.

STATEMENT OF THE FACTS

King and King Enterprises is owned by Carl King and Fred King; the company markets gasoline. King Gas and Oil Company operates retail gas stations in Oklahoma, Arkansas and Texas. This latter company is a sole proprietorship which is owned by Carl King. King and King Enterprises supplies gasoline to the King gas stations.

Champlin Petroleum Company is an integrated oil company which refines gasoline and sells gasoline at both levels, retail and wholesale, in Oklahoma, Arkansas and Texas under the brand names of Champlin and Harbor.

When King entered the gasoline market in Oklahoma, Texas and Arkansas, which was in 1966 or 1967, there were three types of retail gasoline marketers. At the top were the major oil companies such as Texaco, Shell and Phillips, which companies were vertically integrated in that they operated refineries and sold gas both at wholesale and retail levels. These companies operated full service gas stations and sold products other than gas, such as batteries, tires, and accessories. They advertised and accepted credit cards.

In the middle were the mini-majors or branded independents such as Champlin, Apco, Consumers and Fina. These stations generally were the full service type. They operated in the same fashion as the majors but did not have the national reputation enjoyed by the majors and sometimes were not vertically integrated. Below the "mini-majors" were full service unbranded independents, such as Hudson Oil Co.

At the time (1966, 1967) King entered the gas market in the states mentioned above, the majors' normal price for regular gasoline was 34.9 cents per gallon. The mini-major normal price for regular gasoline was 32.9 cents per gallon, and the branded independent's normal price for regular gasoline was 31.9 cents per gallon. The difference in the prices of gasoline between the three types of stations was called a "spot." By this is meant that the mini-majors had a two cent spot on the majors and the un-

branded independents had a one cent spot on the mini-majors. King was and is a self-service unbranded independent marketer. It decided to take a two cent spot on Hudson and other full service independents, and to charge 29.9 cents per gallon for regular gas. King had determined that this was its optimum price, which would allow it to maximize gross profits and volume of sales. Prior to King's entry in the market there were no unbranded self-service independents who took a spot on the mini-majors and full service unbranded independents. King was an admitted price cutter and was the first self-service marketer to attempt to take such a spot.

## GENERAL NATURE OF THE CASE

King alleged that Champlin freely and regularly exchanged market information with its competitors, not including King however, and entered into price fixing agreements with those competitors for the purpose of forcing King, and other self-service unbranded independents who proceeded as King was proceeding in taking a spot on the full service unbranded independents, to eliminate their spot, and, thus, to eliminate price cutting. It was the claim of King that Champlin first tried to dictate King's selling price by threatening to take the price of gas "to the bottom," that is, below King's actual cost for the gas, if King refused to eliminate its spot. When King failed to do so, Champlin and his co-conspirators collusively agreed to lower prices below an acceptable level to King and restore prices to normal once they felt King had suffered by low prices to such an extent that King would be willing to surrender. King alleged that the method employed to accomplish the goals was as follows:

Champlin and its co-conspirators granted competitive price allowances (CPAs) to their dealers. Under the competitive price allowances Champlin and others would guarantee their dealers a certain margin of profit, so that even when the dealers were selling gas at lower than normal prices, the dealers were still able to make a dependable margin of profit. Thus, Champlin and its co-conspirators, rather than their dealers, would absorb the loss caused by the sale of gasoline at lower than normal prices. Champlin and its competitors would recommend that their dealers sell at lower than normal prices and the dealers would still make a profit. Prices would go down in a stairstep pattern with King reducing his prices accordingly to keep his spot. When prices reached the bottom, that is at or near the cost of the gasoline to King, the Champlin dealers were guaranteed a profit because of the competitive price allowances, while King, who did not receive these allowances, was forced to absorb the entire loss caused by the price decreases. This CPA program, of course, cost Champlin and its co-conspirators a great deal of money. Thus, as soon as practicable the companies were anxious to restore the market to its normal level by pulling back the CPAs when it was felt that King had been sufficiently harmed and would be ready to surrender. Therefore the companies conspired to pull their CPAs and fix the price of gasoline at a certain level. As a result of Champlin's price fixing activities, King alleges that it was unable to sell gasoline at its optimum price and was injured thereby.

Champlin, on the other hand, rather than directly addressing King's price fixing claims, appears to have been arguing that: "If King has any cause of action at all, it is one for predatory and coercive pricing; but King doesn't have a claim for predatory and coercive price because . . . ." The appellant's contentions caused great confusion during the trial of the case for the reason that they were insisting on being allowed to defend a predatory and coercive pricing claim, whereas the only claim that was being litigated by the plaintiffs was one of price fixing. It should be brought out here and now that regardless of appellant's thought that King's claim should have been for predatory and coercive pricing, a claim which it was apparently prepared to defend itself against, the fact remains that King did confine itself to a claim for price fixing at the trial. King had withdrawn its claim based on predatory and coercive pricing prior to trial. So, inasmuch as predatory and

coercive pricing was not a claim at the trial, it was not possible for the appellant, Champlin, to offer a defense against such claim. Much of the evidence which appellant sought to introduce at trial was therefore rejected by the trial court. Because of the lack of effective communication between the parties, the lawyers for both spent a great deal of time at the bench arguing evidentiary matters to the judge out of the presence of the jury.

Champlin raises several questions on this appeal:

1. That it was error for the trial court to receive in evidence testimony of Mr. Caldwell, an expert witness called by the plaintiffs, regarding calculations which he made as to the sum total of losses suffered by plaintiffs during the years in question.

2. That it was error to refuse to instruct the jury on the law applicable to predatory and coercive pricing and refusal to deal.

3. That it was error to refuse to present the jury with the question of whether plaintiffs' claim was barred by the statute of limitations.

4. That the court erred in massive exclusions of evidence for the defense, in that the court (a) failed to allow Champlin to deny accusations against it; (b) precluded Champlin from proving its economic incapacity to rig the market; (c) precluded Champlin from refuting predatory pricing claims; (d) precluded Champlin from challenging the Caldwell calculations.

5. That it was error to foreclose Champlin's use of depositions of parties and managing agents.

In general it is also argued by Champlin that it suffered from the prejudice and animosity shown by the trial judge toward it. From the examination of the record we do not believe that the latter claim has any justification whatsoever. The record discloses that the judge was very patient indeed with Champlin's lawyers. It is true that he ruled against them in many instances but in many instances he was fully justified in doing so.

## DEFINITION AND EVIDENCE IN SUPPORT OF CONTENTION OF PLAINTIFFS THAT DEFENDANT WAS GUILTY OF PRICE FIXING

Section 1 of the Sherman Act provides in pertinent part that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several states, or with foreign nations, is declared to be illegal. . . .

Price fixing agreements are per se violations of § 1 of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), reh. den. 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421; *Bryan v. Stillwater Board of Realtors*, 578 F.2d 1319 (10th Cir. 1977); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir. 1979); *United States v. Sigma*, 1980—1 Trade CAS. ¶ 63,097 (4th Cir. 1979).

If the defendants' purpose was to fix prices, it is not material that they had reasonable goals for doing so. *United States v. Socony-Vacuum Oil Co., supra; United States v. McKesson and Robbins, Inc.*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). In *Socony-Vacuum Oil* the Supreme Court considered an alleged conspiracy to raise gasoline prices for the purpose of stabilizing the market. The Court found that the defendant's purpose was to fix prices, and the evidence showed that the conspiracy at least contributed to the rise in prices. The Court stated that the fact that other factors may also have contributed to the price rise was not material. It was held that even if the purpose of the conspiracy was to eliminate the evils within the system, with an aim of establishing more reasonable and more fair prices, the conspiracy was nevertheless violative of the Sherman Act. The Court held there exists no justification for price fixing in a free economy.

Therefore, the Court found that it was permissible to exclude evidence seeking to show the reasonableness of the conspiracy, since such evidence is irrelevant under the Sherman Act. The Court stated that an agreement among competitors to follow a practice of buying surplus gas on the spot market for the purpose of preventing prices from falling sharply was unlawful, regardless of how reasonable it was believed to be, even though there was not shown to be a direct agreement among the conspirators in the actual prices which were being maintained.

In *McKesson and Robbins, supra*, the Supreme Court said:

It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or decrease prices.

76 S.Ct. at 940. The Supreme Court further stated:

Congress has marked the limitations beyond which price fixing cannot go. We are not only bound by those limitations but we are bound to construe them strictly, since resale price maintenance is a privilege restrictive of a free economy. (citation omitted).

Id. at 943–44.

■ Illegal price fixing includes informal and indirect, as well as formal and direct, agreements to exchange price information or fix prices. *Catalano, Inc. v. Target Sales, supra; United States v. Container Corporation of America, supra*. In *Catalano*, the charge was that respondent wholesalers secretly agreed to sell to retailers only if payments were made in advance or upon delivery. That is, the wholesalers agreed to limit all credit sales, whereas before the agreement the wholesalers had competed with one another in regard to the granting of credit and the terms thereof. The majority of the court of appeals held that the agreement to withhold credit did not constitute price fixing. The dissent disagreed on the ground that the extension of interest free credit is an indirect price reduction, and elimination of such credit was thus a method of raising prices. The Supreme Court agreed with the dissent, and reversed the decision of the court of appeals. The Supreme Court stated that the mere fact that a practice entailing a risk of obvious anticompetitive impact "may turn out to be harmless in a particular set of circumstances will not prevent it being declared illegal per se." 100 S.Ct. at 1928.

Furthermore, in *Container Corporation of America, supra*, the defendant's activity included an agreement to exchange price information, but no agreement to adhere to a price schedule as in *United States v. Socony-Vacuum Oil Co., supra*. The Supreme Court's holding was that the result of this reciprocal exchange of price information was to stabilize prices, since when one competitor received knowledge of another competitor's price, he ordinarily matched that price. The holding was that this reduction of price competition constituted price fixing. The Court said "[p]rice is too critical, too sensitive a control to allow it to be used in even an informal manner in order to restrain competition." 89 S.Ct. at 513. *See also, American Column and Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921).

The Supreme Court's strict enforcement of the prohibition against suppressing competition is emphasized in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). There the Court held that an agreement among competitors to refuse to discuss prices with customers until after negotiations had resulted in the selection of an engineer restricted trade within the meaning of § 1 of the Sherman Act. The Court reached this conclusion even though the defendant's activity was not express price fixing. Thus the ruling was that the agreement operated as an absolute ban to competitive bidding, as a result of which customers were deprived of the ability to compare prices when selecting engineering services.

It has also been held that price fixing can be shown by direct or circumstantial evidence. *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Edward J. Sweeney and Sons v. Texaco,* 637 F.2d 105 (3rd Cir. 1980); *Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242 (10th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). In *Interstate Circuit,* the Supreme Court stated that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous agreement on the part of the conspirators." *See* 306 U.S. at 227, 59 S.Ct. at 474. In *Sweeney,* the court held that direct proof of an express agreement is not a requisite, that the plaintiff may rely on an inference of a common understanding drawn from basic evidence, although not from mere speculation.

■ It is also a requisite that the evidence is to be considered as a whole to determine whether a price fixing conspiracy existed and whether defendants were part of that conspiracy. *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Cackling Acres v. Olson Farms, supra.* In *Cackling Acres* it was said by this court that "a conspiracy must be judged by its constituent parts and the jury must look at the alleged conspiracy in its totality. A conspiracy may be implied by a course of conduct and other circumstantial evidence." 541 F.2d at 245. This proposition is somewhat fundamental. However, it is entitled to be particularly considered in the case at bar because much of the evidence deals with the raising of prices rather than the lowering of prices. Yet, the fact that there was a secret and well organized effort to fix prices certainly establishes that the defendants were engaged in both as part of the whole scheme. Thus, both the direct and circumstantial evidence in this case overwhelmingly supports the plaintiffs allegations that there was price fixing. A summary of the evidence shows without question that this is true.

One of the witnesses, Dea Entriken, who was formerly assistant Regional Manager of Product Pricing at Champlin, testified at some length that his job at Champlin required him to call competitors and arrange to pull their CPAs and raise the retail price of gas to a certain level at a certain date. Two of Champlin's competitors, Jim Ozment and Robert Alves, also testified to talking with Entriken on the phone for that purpose. Becky Rhoads, who was one of Champlin's pricing clerks, testified that Entriken and his immediate supervisor, Dewey Mason, Champlin's Regional Manager of Product Pricing, were talking to competitors on the phone and were agreeing on prices. Gail Campbell, another of Champlin's pricing clerks, testified that Entriken and Mason were talking with others on the phone in an effort to restore the gas market to normal.

Records which were kept by Entriken during the course of his employment at Champlin, including notes made while he was talking on the phone, revealed his conversations with competitors on the matter of setting future prices. The notes showed such statements as "all are committed," and such and such a company "will move to 31.9," and these companies "will 31."

There was a "talk/no talk" document which had been prepared by Mason and given to Entriken. Entriken testified that the purpose of this document was to distinguish those competitors it was safe to talk with about prices, because they would maintain the confidentiality of the conversations, from those Entriken should not talk with for the opposite reason. Bob Parker of FINA was originally on the "no talk" column. Later, Mason gave Entriken a note which said it was now okay for Entriken to talk to Parker. Entriken testified that after receiving that note he talked with Parker about future price moves.

Mason himself testified that he spent a great deal of time talking to competitors, in an effort to find out what was happening in the market. Mason, however, denied giving and receiving specific information about future price moves.

Entriken and Mason each had approximately 500–1200 phone conversations per month with competitors.

The evidence showed price uniformity between Champlin and its competitors during the relevant period.

Fred King and Sam Olson, King's former supervisor, testified that Champlin and its co-conspirators called them many times to attempt to convince King to eliminate its spot, and King refused.

■ This evidence strongly supports King's claim that Champlin was involved in a collusive effort to attempt to force King to eliminate its spot by first bringing prices down, and then agreeing to bring prices up, so that King could not sell gas at optimum prices. *See also, United States v. Sigma, supra,* and *Phillips v. Crown Central Petroleum Co.,* 602 F.2d 616 (4th Cir. 1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980), where plaintiffs made similar claims to the claims at bar. The courts held that the evidence was sufficient to show a price fixing conspiracy. The evidence of price fixing in the latter cases was not as strong as the evidence in the case at bar.

This legal and factual background provides the basis for proceeding to address Champlin's contentions on this appeal.

## ARE THE CLAIMS OF THE PLAINTIFFS BARRED BY THE STATUTE OF LIMITATIONS?

Section 4B of the Clayton Act, as amended, (15 U.S.C. § 15b) requires that antitrust actions be commenced within four years of the date the cause of action accrued. The complaint here in question was filed on October 2, 1975. Defendant-appellant maintains that a percentage of the plaintiff's claims which arose prior to October 2, 1971 were barred by the statute of limitations, or, in the alternative, that the question should have been submitted to the jury. It is the position of the plaintiffs that there has been fraudulent concealment through the undercover actions of the defendant-appellant and that this tolls every federal statute. *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Public Service Co. v. General Electric Co.,* 315 F.2d 306 (10th Cir. 1963), *cert. denied,* 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033; *King and King Enterprises v. Champlin Petroleum Co.,* 446 F.Supp. 906 (E.D.Okl.1978). The allegation to the effect that Champlin and its co-conspirators were guilty of fraudulent concealment of their illegal conduct and of their conspiracy is set forth with particularity in the complaint.

In *Ashland Oil Co. of Cal. v. Union Oil Co. of Cal.,* 567 F.2d 984, 988 (T.E.C.A., 1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978) the court said:

> [w]here acts causing injury are fraudulently concealed from the injured party or where fraud furnishing the basis of an action is of such nature as to conceal itself, a statute of limitation is tolled until the injured party discovers, or with due diligence could have discovered, the injury. (Citations omitted). It is clear, however, that mere ignorance on the part of a plaintiff is not sufficient. (Citation omitted.)

The Temporary Emergency Court of Appeals further said that to prevail on its claim that the statute of limitations was tolled, plaintiff "would have to establish either that the defendant fraudulently concealed the conduct forming the basis of the claim or that the defendant's conduct by reason of its fraudulent nature was inherently self-concealing."

In our case both parties agree that the district court, in an earlier proceeding involving this case, correctly stated the applicable law. The court's language is as follows:

> The party asserting the fraudulent concealment doctrine has the burden of showing (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action. (Citations omitted.)
>
> . . . .
>
> [O]nce it appears that the statute of limitations has run, the plaintiff must sustain

the burden of showing not merely that he failed to discover his cause of action prior to the running of the statute of limitations, but also that he exercised due diligence and that some affirmative act of fraudulent concealment frustrated discovery notwithstanding such diligence. (citation omitted).

*King and King Enterprises v. Champlin Petroleum Co., supra*, 446 F.Supp. at 911. The district court also said:

> A denial of an accusation of wrongdoing does not constitute fraudulent concealment. *Dayco Corp. v. Firestone Fire & Rubber Co.*, 386 F.Supp. 546, 549 (N.D.Ohio, 1974), aff'd, 523 F.2d 389 (6th Cir. 1975). The statute of limitations is not tolled on account of a party's failure to discover, *Public Service Co. v. General Electric Co.*, 315 F.2d 306, 310 (10th Cir.), *cert. denied*, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963), and, in the absence of a fiduciary duty between the parties, mere failure to disclose the existence of a cause of action does not constitute fraudulent concealment. *Kansas City v. Federal Pacific Electric Co.*, 310 F.2d 271, 278 (8th Cir.), *cert. denied*, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed. 171 (1962); *Burnham Chemical Co. v. Borax Consolidated*, 170 F.2d 569, 577 (9th Cir. 1948), *cert. denied*, 366 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949); *Dayco Corp. v. Firestone Tire & Rubber Co.*, 386 F.Supp. 546, 549 (N.D.Ohio 1974), aff'd, 523 F.2d 389 (6th Cir. 1975). *See, Laundry Equipment Sales Corp. v. Borg-Warner Corp.*, 334 F.2d 788, 792 (7th Cir. 1964); *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 87 (2nd Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961).

*Id.* at 912.

The question is whether the evidence established fraudulent concealment as a matter of law. The conclusion we reach is that the evidence overwhelmingly supports the proposition that all price fixing activity was concealed by Champlin. It appears from the record that Mr. Dewey Mason, Champlin's Regional Manager of Product Pricing at the time, prepared a document with two columns of names. One of these was entitled a "talk" column, and contained names of persons to whom they could speak, and the second column was entitled a "no talk" column. The witness Entriken testified that the purpose of the "talk/no talk" document was to separate the names of the reliable people from the names of those who were unreliable, in that they could not keep a confidence. Entriken testified that he was given the document so that he would not place calls to the wrong people. He also testified that he often made his price fixing calls after normal working hours, and that Champlin's price fixing agreements were all made "under cover." In fact, Champlin's own witnesses, including William Biggersmith, a vice president at Champlin, Kenneth Richardson, Champlin's Regional Manager of Marketing Operations, and Mickey Bowles, Champlin's Manager of Product Pricing and Allocation, testified that any conspiracy which Champlin may have been involved in to fix prices of gasoline had been concealed. All of Kings' witnesses testified that they had not known of Champlin's price fixing activities. The evidence shows that knowledge of the price fixing conspiracy was not revealed to anyone connected with King until 1975, the year that the action was filed.

There is not one bit of evidence in the record from which the jury could have entertained the thought that the price fixing conspiracy, if the jury believed that a conspiracy did exist, had not been fraudulently concealed. Since there was no issue of fact for the jury to determine, the trial court correctly determined this issue as a matter of law. Hence Champlin's contention that this question should have been determined by the jury has neither merit nor substance.

Champlin maintains that the fact that King lowered its prices below its desired level where he could make a profit in order to meet predatorily low prices charged by Champlin and subsequently raised its prices above the desired level because of coercion by Champlin. Champlin claims that this is contradictory of any claim of fraudulent concealment. Champlin argues that since

King knew that Champlin was lowering and raising prices in a manner alleged to be illegal, there was no fraudulent concealment. Champlin has missed the target. King did not claim at this trial that it was injured by virtue of predatory pricing. It claimed to have been injured as a result of a concealed conspiracy by Champlin and other co-conspirators to fix prices. Mere knowledge that Champlin was raising and lowering prices does not provide knowledge that Champlin was agreeing with other members of the gasoline industry to fix prices. At the time that King was seeing the phenomena of lowering and raising of prices, he was not thereby notified that Champlin was fixing prices. The evidence pertaining to price fixing points to concealment of those activities.

It is true that where there is a dispute as to the existence of fraudulent concealment, the question is one for the jury. *See, Robertson v. Seidman and Seidman*, 609 F.2d 583 (2nd Cir. 1979); *Pan American Petroleum Corp. v. Orr*, 319 F.2d 612 (5th Cir. 1963); *Crummer Co. v. DuPont*, 255 F.2d 425 (5th Cir. 1958), *cert. denied*, 358 U.S. 884, 79 S.Ct. 119, 3 L.Ed.2d 113. The evidence in this case shows no dispute over the question as to whether the price fixing activities of the defendant were concealed. In fact, the defendant's own employees testified that if there had been a price fixing conspiracy, it had been concealed. There was no indication in the record that plaintiff had been put on inquiry in any way of the defendant's price fixing activities. In the absence of a factual question for the jury to resolve, our holding has to be that the trial court correctly decided this issue as a matter of law. Both of the tests which were set forth in *Ashland Oil Co., supra*, were met here. The evidence showed that the defendant actively sought to conceal its price fixing activities, and the defendant's conduct, by reason of its fraudulent nature, was inherently self concealing.

## WAS THE AWARD OF DAMAGES EXCESSIVE?

The allegation of the plaintiffs was that it suffered damages in the amount of $755,-942 as follows: $270,919 for twelve operating gas stations; $302,352 for six planned stations that were never opened, and $182,641 for four stations that were closed. However, the jury awarded plaintiffs the sum of $1,205,942 (before trebling) which consisted of $450,000 in excess of the amount requested. The trial court reduced the judgment by remittitur to $755,942 and trebled that amount pursuant to 15 U.S.C. § 15. The consequential total amount of damages was $2,267,826. Neither party appealed the remittitur action of itself. Champlin appeals the award of $755,942 prior to trebling on several grounds. One of these was that which we have already discussed, that a segment of the damages were barred by the statute of limitations. Additionally, Champlin maintains that the evidence does not support the damages and that the method employed by King's accountant, Grant Caldwell, to calculate damages was unreliable. Champlin argues that the Caldwell calculations should not have been admitted into evidence.

The law on establishing damages in antitrust actions has been well defined. First, it is necessary to show that there is a causal connection between the defendant's actions violative of the Sherman Act and the actual injury to the plaintiffs' business. Second, once the causal connection is established, it is necessary to quantify the amount of damages sustained by the plaintiff. Establishing damages in an antitrust action, therefore, involves a two step process.

With respect to the first step, the establishment of a causal link, the Supreme Court stated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, 89 S.Ct. 1562, 1571, 23 L.Ed.2d 129, n. 9, as follows:

> [The plaintiffs] burden of proving the fact of damages under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the

injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

With respect to the second step, the quantification of damages, the Supreme Court has stated that in antitrust cases a plaintiff is not to be held to a rigid standard of proof regarding the amount of damages, since in such cases economic harm is frequently intangible and difficult to quantify. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–65, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). However, damages may not be merely speculative. There must be reasonable evidence from which a jury can rationally infer the amount of damages. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). It is against this background that we must review the challenges of appellants.

Champlin's position that the award of damages should not be upheld is predicated upon three decisions which they have cited: *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); and *Continental Baking Co. v. Utah Pie Co.*, 396 F.2d 161 (10th Cir. 1968), *cert. denied*, 393 U.S. 860, 89 S.Ct. 136, 21 L.Ed.2d 128. In all of these cases, the courts held that there was an inadequate evidentiary basis for quantification of the plaintiffs' damages. On that ground the courts held that damages based on the accountant's calculations could not be upheld.

In *Gray*, the figures which the accountant was given by the plaintiffs as a basis for his calculations of lost profits were based on plaintiffs' "feelings" that they were entitled to additional margins of profit, and the purely speculative claim that their retail gas prices could have been raised six cents per gallon without any resultant loss in the volume of gasoline sales.

In *Hawaiian Oke*, the figures relied upon by the accountant in determining losses were found to have been expressly contradicted in the record. In addition, the accountant in *Hawaiian Oke* based his calculations of lost profits partially on a projected growth rate.

In *Utah Pie* the exhibits relied on by the accountant in computing lost profits against one of the defendants were found to have "presented a clearly erroneous factual foundation for the computation of damages." 396 F.2d at 191. Moreover, it was found by this court that the evidence showed that plaintiffs' damages were not caused by Sherman Act violations of the defendants, but were caused by other reasons altogether. Therefore, it was concluded that plaintiffs' claims for damages for injury to its goodwill were based on mere hypothetical predictions.

In our judgment, Champlin's reliance on these cases is inadequate and misplaced. A reading of the record in the case clearly indicates that the evidentiary problems present in *Gray, Hawaiian Oke* and *Utah Pie* are not present here. We will, however, discuss the evidence with respect to each of the plaintiffs' claims for damages and the mode of calculating damages for each claim.

A. *Discussion of the Damages Claimed for the Twelve Operating Stations*:

Plaintiffs' alleged damages to twelve operating service stations from January 1, 1972 through March 31, 1973 growing out of the price fixing activities of the defendant. At the beginning we note that this claim for damages is entitled "the predatory and coercive pricing" claim. This is a misnomer. It has been determined that all of the evidence presented and all of the instructions to the jury were on price fixing alone. There remains no question that the jury would not have understood this phrase to refer to price fixing. The jury was never presented, or confronted with, the subject of predatory pricing; it would have no reason to assume that phrase meant anything other than price fixing. All the evidence

that they saw and heard went in to price fixing.

Our inquiry into whether a causal connection has been established regarding the price fixing claim has been addressed previously. It is sufficient to say that there was an overabundance of evidence from which the jury could reasonably have concluded that the defendant was engaged in price fixing, and that such activity injured the plaintiffs in their operating service stations. Our sole inquiry into plaintiffs' first claim for damages, therefore, concerns the quantification of those damages.

The method of calculating damages to the twelve operating stations for the relevant period was as follows: The accountant, Caldwell, based his calculations on the daily sales records, the monthly profit and loss statements, and other records of King's gas stations. The established damages for each operating station were calculated in this manner:

The average profit margin per time shift, that is, the retail price of gasoline sold less the cost of that gasoline, was calculated for those periods of time during which the plaintiffs were selling gasoline at the desired prices (29.9 and 30.9 for regular gas; 31.9 and 32.9 for premium gas). Those margins were measured against the average margin per shift realized when plaintiffs were selling gas at other than the desired prices. The figures computed for the average margin per shift when plaintiffs were selling at prices other than the desired prices were subtracted from the figures computed for the average margin per shift when plaintiff was selling at the desired prices. The differential for each station was multiplied times the number of shifts in calculating the estimated damages from lost profits due to defendant's price fixing activities. Profits and estimated losses of each station were compared only against the station's own actual performance. One station was not measured against any other station. Where records were incomplete, they were disregarded. No growth projections of future earnings were made. The total damages for this claim were thus estimated as follows:

| Store No. | Regular | Premium | Total |
|---|---|---|---|
| 1 | $ 29,820 | $ 19,578 | $ 49,398 |
| 2 | 9,421 | 5,305 | 14,726 |
| 3 | 22,350 | 12,918 | 35,268 |
| 4 | 33,271 | 15,607 | 48,878 |
| 5 | 36,555 | 14,903 | 51,458 |
| 9 | 4,918 | 5,503 | 10,421 |
| 10 | 3,610 | 4,141 | 7,751 |
| 11 | 6,279 | 8,675 | 14,954 |
| 12 | 5,307 | 1,300 | 6,607 |
| 13 | 17,108 | 2,641 | 19,749 |
| 14 | 5,851 | 4,531 | 10,382 |
| 15 | 757 | 570 | 1,327 |
| Totals | $175,247 | $ 95,672 | $270,919 |

The sum total of damages claimed for the twelve stations was $270,919.

■ It is our view that this method of computing damages is reasonable. Unlike the cases relied upon by Champlin, *supra*, the evidence in this case fully supports the reliability of the figures used as a comparative basis for calculating lost profits, no speculative projected growth rates were incorporated into the calculations of lost profits, and, as previously mentioned, the evidence fully supports the jury's verdict that defendant's price fixing activities were the cause of any damages suffered by King's operating stations during the relevant period.

As was said by this court in *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242 (10th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), once there is found to be sufficient factual evidence of damages, the plaintiffs are not obligated to establish the quantum of damages "with mathematical precision so long as the extent of such damages was not left to jury speculation." 541 F.2d at 246. If the calculations upon which the loss of profits are based are estimated in any reasonable way and the underlying assumptions on which the accountant relied are not without support in the record, the calculations may be upheld as a valid means of measuring loss of profits. *Union Carbide and Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), *cert. denied*, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). *See also, Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467 (7th Cir. 1980), *cert. denied*, —— U.S. ——,

101 S.Ct. 1999, 68 L.Ed.2d 312 (1981); *Trabert and Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir. 1980); *Woods Exploration and Producing Co. v. Aluminum Co. of America*, 509 F.2d 784 (5th Cir. 1975), *cert. denied*, 423 U.S. 833, 96 S.Ct. 59, 46 L.Ed.2d 52; *Terrell v. Household Goods Carriers Bureau*, 494 F.2d 16 (5th Cir. 1974); *cert. denied*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260; *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *Locklin v. Day Glo Color Corp.*, 429 F.2d 873 (7th Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 346 F.2d 661 (6th Cir. 1965), *cert. denied*, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157.

In the Fifth Circuit decision in *Malcolm v. Marathon Oil*, 642 F.2d 845 (5th Cir., 1981), an independent gasoline retailer, an admitted price cutter during the period from 1965–1972, sought damages from the defendants for antitrust violations. The district court directed a verdict against the plaintiff because it found that Malcolm's evidence was insufficient on the fact of injury and the amount of damages. The Fifth Circuit reversed the opinion of the district court. It limited its review solely to the question of whether the plaintiff had presented sufficient evidence of injury in fact and the amount of damages to warrant submission of the case to the jury. The issue in *Malcolm* was predatory pricing, rather than price fixing. However, when determining whether the evidence warranted submission to the jury on the question of injury in fact, the court stated that the plaintiff had "sufficiently shown that his profit maximizing price was greater than the low market price effectively set by the conspirators in those specific cases of unnaturally low prices testified to . . . ." 642 F.2d at 857, n.22. The court noted that by offering proof that the price was below what Malcolm, "in his business judgment, obviously believed was his profit maximizing price in the competitive market . . . [Malcolm] offered proof that he was injured by these low prices." The court went on to state that, having provided sufficient evidence of injury in fact, the question of the amount of damages should also be presented to the jury, since "the antitrust plaintiffs burden of proving the amount of damages is lighter than the burden of proving injury in fact . . . [and] it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Id.* at 858.

In *Malcolm* the plaintiff had contended that, absent collusion by the defendants, a "normal" price for gas prevailed in the gasoline market, and the plaintiffs' practice was to price approximately two cents below the "normal" price of other independents. The court held in *Malcolm* that the plaintiff could rely upon the "normal price" as a benchmark for establishing damages due to predatory pricing. We agree and hold that the plaintiff herein should be permitted to rely upon the "normal price" as a benchmark for establishing damages as a result of price fixing. To hold differently would be to preclude antitrust plaintiffs from prevailing, even when a per se violation of the Sherman Act is present, since there is no absolutely "sure" way of establishing damages in such cases. Thus, this would defeat the entire purpose of the antitrust laws.

Based on the record, then, and the foregoing authorities, it is our holding that the method of estimating damages as to plaintiffs' first claim was not erroneous.

B. *Are the Plaintiffs Entitled to Recover Damages Growing Out of the Closing of the Four Stations?*

As indicated, plaintiffs claimed damages for commissions and profits lost for four stations which allegedly were closed as a result of the defendant's price fixing activities. The four stations included one in Tulsa, one in Oklahoma City, one in Stillwater, Oklahoma, and one in Mountainburg, Arkansas. The latter station was only closed in 1973 for a total of ⅝th of the period in question (1972–1975). The three Oklahoma stations were closed prior to 1972, and thus were closed for the entire period in question.

Following our foregoing analysis, before discussing the method of quantifying damage, it is necessary to ask whether the evidence supports a factual assumption that the stations were closed because of the alleged activities of the defendant. As previously noted, unless the record supports a finding of such causal connection the method of quantifying damages becomes academic and irrelevant.

The record does show that Carl King gave testimony that the four stations were required to close because of lack of profitability. Sam Olson and Fred King both testified that these stations were closed because of the price disturbances caused by the price fixing activities of the defendant. The jury may have reasonably inferred from this testimony that the stations were closed because they were unprofitable, and that they were unprofitable because of the collusive activities of the defendant. Mr. Olson testified the reason the stations were closed was that King could not maintain a volume of sales at a high enough price to make money, and that the defendant's actions were responsible for this fact. Fred King testified that the stations were closed because of the depressed prices in the area, and that there was a definite correlation between the depressed market and the defendant's overall price fixing scheme. Based on the evidence, therefore, it is not to be said that there was an insufficient basis in the record in support of the assumption that these four stations were closed because of the defendant's illegal actions. Indeed, there was no evidence in the record to indicate that the stations had closed for any other reason.

We next consider the question of whether Caldwell's methods of quantifying the damages withstands judicial examination and scrutiny. Mr. Caldwell calculated the estimated damages for loss of profits and commissions due to the closing of these four stations as follows: Three of King's operating stations, Admiral Place in Tulsa, North May in Oklahoma City, and a station in Bethany, Oklahoma (numbers 1, 4 and 5 on the list of twelve operating stations above), were chosen as comparatives, or representative stations. Mr. Caldwell used the net profits of those stations for 1972–75, as reflected in the books and records of the stations, and added to that a portion of the claim for each of those stations under the damages alleged to have been sustained by the twelve King stations in operation due to the price fixing activities of the defendant for 1972 and three months of 1973. The total of these figures was divided by four, since the damages were alleged for a period of four years, from 1972–1975. This figure was then multiplied by $3\frac{5}{8}$ths, to reach a profit average representative of each of the four gas stations, having an actual total closing time of $3\frac{5}{8}$ths of the four years. In calculating the actual profits of the three comparison stations, Mr. Caldwell acted conservatively. For example, the Admiral Place station actually operated for approximately one month only in 1975, and realized a loss, rather than a profit, of $2,746. This loss was included in (i. e. subtracted from) the actual average profits realized by the stations for the four years. The actual figures were as follows:

| | | Station | | | |
|---|---|---|---|---|---|
| | | Admiral Place | North May | Bethany | Total |
| 1972 | Actual Net Profit | $ 2,011 | $ 7,472 | $ 11,707 | $ 21,190 |
| 1973 | Actual Net Profit | (46) | 6,161 | 6,875 | 12,990 |
| 1974 | Actual Net Profit | 9,554 | 4,027 | 6,373 | 19,954 |
| 1975 | Actual Net Profit | (2,746) | 2,507 | 5,768 | 5,529 |

| Additional profits based on pricing damage claim within above year | 10,539 | 18,496 | 17,527 | 46,562 |
|---|---|---|---|---|
| | $19,312 | $ 38,663 | $ 48,250 | $106,225 |
| Four year average per station | | | | 35,408 |
| Number of stations closed | | | | 3 5/8 |
| Damage claim | | | | $128,354 |

In addition, Caldwell separately computed the average annual commission that the individual stations paid King Enterprises for each gallon of gas purchased, in order to calculate the estimated loss of commissions to King. This figure was excluded from the prior computations, and was not used in figuring the prior claims for damages; therefore, there was no duplication of damages. The two figures were separated for clarity. The total gallons of gas sold by the three comparison stations was obtained for the years 1972–1975. Data for the Admiral Place station for 1975 was not available, and the time period in computing average gallons sold was adjusted accordingly. An average annual commission of ½ cent per gallon was multiplied by the average annual gallons per station to arrive at annual average commissions lost for each of the four stations. This figure was multiplied by 3⅝ths. The calculations were as follows:

| | | Station | | | |
|---|---|---|---|---|---|
| | | Admiral Place | North May | Bethany | Total |
| 1972 | Gallons | 686,035 | 926,225 | 1,081,068 | 2,693,328 |
| 1973 | Gallons | 439,989 | 660,389 | 630,183 | 1,730,561 |
| 1974 | Gallons | 638,746 | 583,964 | 753,702 | 1,976,412 |
| 1975 | Gallons | — | 960,094 | 881,520 | 1,841,614 |
| | | 1,764,770 | 3,130,672 | 3,346,473 | 8,241,915 |
| | Months | 36 | 48 | 48 | 132 |
| | Average gallon per month | 49,021 | 65,222 | 69,718 | 62,439 |
| | Average per year | | | | 749,268 |
| | Commission @ ½¢ per gallon per year | | | | $ 3,746 |
| | Times 4 years | | | | $ 14,984 |
| | Number of stations closed | | | | 3 5/8 |
| | Damage claim | | | | 54,317 |

The total damages claimed for the four closed stations was, thus, $182,671 ($54,317 for loss of commissions and $128,354 for loss of profits).

The question is whether use of these three stations as comparatives for the four closed stations is reasonable. Champlin contends that there is no evidentiary basis upon which to reach the conclusion that the closed stations would have been equally as profitable as the three comparative stations. Such evidence could not be in the record, however, since there is no way of establishing "what might have been." This court has thoroughly explained the rationale to be followed in cases where it is impossible to prove the non-provable. *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97 (10th Cir. 1973), *cert. de-*

*nied,* 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218.[1]

■ There was evidence in the record from which the jury could have reasonably assumed that King's closure of the four stations was caused by the actions of the defendant. If the jury did so find, therefore, that the defendant's illegal activities led to the closing of the stations, the inability to prove exactly what profits the closed stations would have realized if they had not closed should not preclude the plaintiff from recovering.

Champlin's expert witness called to rebut the damage study prepared by Mr. Caldwell, Dr. Richard H. Leftwich, was permitted to testify at length that the assumption that the four closed stations would realize profits equal to the three metropolitan comparative stations, and the assumption that King could have sold at the optimum level of pricing if the stations had remained open, were economically unsound. Champlin's officers, Mr. Biggersmith and Mr. Richardson, also testified to that effect. Thus, the jury was free to believe that version of the study, if it decided to do so. Additionally, the trial court instructed that the jury was to give the expert testimony that weight which it deemed relevant and proper and decide whether the experts' opinions were sound. So the jury was specifically told to analyze this testimony of the plaintiff and the rebuttal by the defendant. There was a specific instruction as to the accounting data which stated "if you feel that these compilations or summaries do not reflect, or are in conflict with, the underlying data which has been admitted into evidence, you may disregard such compilations or summaries, to the extent that they are not supported by the evidence." The jury was thus free to accept or disregard Caldwell's damage study and to accept or disregard Leftwich's conclusion that the study was based on economically unsound assumptions. The jury, of course, resolved this matter in favor of plaintiff.

Dr. Leftwich testified that he know of "no better way to measure damages at the moment." We have no disagreement with that statement. No better way of measuring damages has been revealed to this court, either, and thus we are disinclined to disregard the jury's decision. True, King's least profitable stations, rather than its most profitable ones, could have been used as comparatives. However, the answer to that is that the jury had the entire picture before it and it could have taken that into account in reaching its verdict; it could have rejected damages in that amount if it so chose.

■ The weight and probative value of Caldwell's and Leftwich's testimony was for the jury to decide. *Atlas Building Production Co. v. Diamond Block and Gravel Co.,* 269 F.2d 950 (10th Cir. 1959), *cert. denied,*

---

1. Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such a case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652.

This position was recently reaffirmed by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). It has been otherwise stated: '. . . having thus established the factum of damages, the amount thereof may be fairly approximated by the jury.' *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir.). Also: '. . . When wrongdoers, by their very actions, make it virtually impossible to prove damages precisely, they should not be heard to complain of the method of proof, if the method allowed by the trial court is reasonable under the facts and in the circumstances of the case.' *North Texas Producers Ass'n. v. Young,* 308 F.2d 235, 245 (5th Cir.).

476 F.2d at 111.

363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). *See also, Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874 (1st Cir. 1966). As stated in *Trabert v. Hoeffer, Inc., supra*, 633 F.2d at 484 " . . . in its damage assessment the 'fact finder may act on probability and inference . . . . Even though we may not agree with each step in the [fact finders] reasoning process, we must affirm . . . unless the findings are beyond the pale of sane judgment' (citation omitted)." We hold that the findings of the jury in the case at bar are not excessive. The damages awarded for plaintiffs' second claim are not clearly erroneous.

C. *Were the Plaintiffs Entitled to Claim Damages for the Six Stations That Were on the Drawing Board, So to Speak, But Were Never Opened?*

King's claim in this regard arises by virtue of the fact that it had planned to open six stations in Blackwell, Enid, Guymon, Boise City and Woodward, Oklahoma, and Liberal, Kansas, but that its plans were changed because of Champlin's illegal price fixing and the resultant depressed market. The evidence pertaining to this claim is very weak.

Olson testified that he looked at the stations in Blackwell, Woodward and Liberal, and that he looked at the prospective station in Enid and talked with the owner and her attorney. Olson and Carl King both viewed the prospective stations in Guymon and Boise City and talked with the operators. Mr. Olson and Mr. Fred King testified that the company believed that it was unable to open these planned stations due to the depressed markets, and that the depressed market condition was due to Champlin's price fixing. However, Carl King testified that the failure to open the six planned stations was due to a lack of supply of gasoline. Mr. Olson also testified to that effect. We have noted several times that failure to supply or refusal to deal was not at issue in this case. Defendant was unable to rebut such a claim, and the issue was not presented to the jury. Therefore, damages may not be awarded in this case for failure to supply or refusal to deal.

The claim for damages due to price fixing based on King's failure to open the six allegedly planned stations is not supported by the plaintiffs' own testimony. At most, the evidence shows conflicting allegations by the plaintiffs and Mr. Olson. This evidence is certainly not sufficient to warrant an award of $302,352 in actual damages, or $907,056 after trebling. We hold, therefore, that this portion of the decision below must be reversed. The jury's award of $755,952 must be reduced in the amount of $302,352, the amount awarded for the six planned stations that never opened, to reduce the total amount of the actual damage award to $453,590. Trebling that amount pursuant to 15 U.S.C. § 15 reduces the total damage award to $1,360,770, rather than $2,267,826 as awarded below.

D. *Refusal of the Court to Accept in Evidence the Depositions of Carl King, Sam Olson and Dea Entriken as Substantive Evidence to Their Testimony Notwithstanding that All Three Were Present and Testified at the Trial*

The defendant sought to read the depositions of the three above named persons in their entirety during the trial. The trial court refused to permit this.

Rule 32(a)(2) of the Federal Rules of Civil Procedure provides that a deposition of a party or his managing agent may be used by an adverse party for any purpose. This rule applies to the depositions of the plaintiff, Carl King, and his managing agent, Sam Olson. As to Entriken, it does not have the same application. While Entriken has been named as a third party defendant by the defendant-appellant, that does not make him a party in the case on appeal here.

The fact that Entriken was not a party at the time his deposition was taken does not render the rule inapplicable to Entriken, however. Rule 32 specifies that insofar as the rule applies to agents, the agent must have been an agent at the time the deposition was taken. The Rule does not state

that the party must have been a party at the time his deposition was taken. The policy reasons for requiring that an agent must have been an agent at the time his deposition was taken are cited in 4A, J. Moore's Federal Practice, § 32.4, p. 32–18 (1981) as follows: 1) If the agent had ceased to be an agent of the party at the time of the deposition, he may have been hostile toward the party at that time, and thus it would be unfair to allow his testimony to be used as an admission against the party; and 2) at the time of the deposition the non-agent did not represent the party, and thus could not bind the party. These policy reasons do not apply to a party, however, and thus the fact that Entriken was not a party at the time his deposition was taken is irrelevant.

As far as Mr. Entriken's deposition is concerned, Rule 32 is not relevant as far as this appeal is concerned, since Entriken was not a party in the case between Champlin and King but only in the case between Champlin and Entriken. Thus, the failure to permit the deposition to be used as an admission of Entriken is not relevant to this appeal. Since the case between Champlin and Entriken is not on appeal here, the failure of the trial court to allow unrestricted use of Entriken's deposition is irrelevant to this appeal, and could not constitute reversible error in order to reverse the case between Champlin and King.

We are faced with a different problem, however, in connection with the depositions of Carl King and Sam Olson. Under Rule 32 a party may introduce "as a part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there. . . . [T]he Rule is a restatement of the long recognized rule of evidence that statements of a party which are inconsistent with his claim in litigation are substantively admissible against him." *Community Counseling Service, Inc. v. Reilly*, 317 F.2d 239, 243 (4th Cir. 1963). *See also, Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir. 1978); *Zimmerman v. Safeway Stores, Inc.*, 410 F.2d 1041 (D.C. Cir.1969). However, the situation in the case at bar was not as open and shut as the appellee would like to have it.

We are not denying that the trial court excluded the depositions as a whole as admissions. He did, and this was not expressly in accordance with the Rule. However, in line with our statement a moment ago, the Rule is not open and shut in practice. The trial court has a perfect right to limit the use of the material if it is repetitious or immaterial (*See Fey v. Walston and Co., Inc.*, 493 F.2d 1036 (7th Cir. 1974)), or where the depositions do not add any information to that given in oral testimony by the deponents or the information is irrelevant. *Fenstermacher v. Philadelphia National Bank*, 493 F.2d 333 (3rd Cir. 1974); *Pursche v. Atlas Scraper and Engineer Co.*, 300 F.2d 467 (9th Cir. 1962), *cert. denied*, 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170.[2] A further

2. The *Pursche* case is an authority which is cited by the defendant-appellant in its opening brief supporting its contention that the trial court erred in excluding depositions of Mr. King and his manager, Mr. Sam Olson. It is quite true that the United States Court of Appeals for the Ninth Circuit stated the general rule. The court did not reverse the case on that ground, however, and the language of the court is significant because it is fully applicable here. The Ninth Circuit said:

We do not mean to sanction the practice of indiscriminately offering an entire deposition or encourage any attempt to thus impose upon the court. In *Merchants Motor Freight v. Downing, supra* [227 F.2d 247 (8th Cir. 1955)], the court stated the deposition of a party might be admitted 'subject to the

court's right to exclude such parts thereof as might be unnecessarily repetitious in relation to the witness' testimony on the stand.' No doubt that procedure has merit but we believe as a general rule the better practice is for the court in the first instance to require counsel to specify the particular portions that are deemed relevant and to limit the offer accordingly. Cf. *United States v. United Shoe Machinery Corp.*, 93 F.Supp. 190 (D.C. D.Mass.1950).

But the record does not demonstrate that the error was prejudicial. On three occasions Atlas examined Pursche as an adverse party pursuant to Rule 43(b); the examination covered many matters involved in the action and was not limited by the court; the last of Pursche's appearances followed Atlas' unsuccessful attempt to introduce his deposi-

limitation is the discretion of the court; the handling of depositions is peculiarly vested in the discretion of the trial court. *Reeg v. Shaughnessy*, 570 F.2d 309 (10th Cir. 1978); *Sims Consolidated, Ltd. v. Irrigation Power Equipment, Inc.*, 518 F.2d 413 (10th Cir. 1975), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 141; *Campbell v. Barnett*, 351 F.2d 342 (10th Cir. 1965). As stated in *Reeg, supra*, "[o]bjections to receipt in evidence of depositional testimony, in whole or in part, may be made at trial for any reason which would require the exclusion of the evidence if the witness were present and testifying at trial." 570 F.2d at 316–17.

■ Undoubtedly the trial court erred in flatly ruling that the depositions of the parties could not be used as testimony. However, in addressing this question we note that the counsel for appellee did not select only portions of the depositions which he regarded as being admissions. He simply tendered the depositions in one bundle, and they run on and on. Certainly those portions that were repetitious or irrelevant could be excluded. As to those portions of the depositions which were not repetitious or irrelevant, it is impossible to see that any substantive rights of Champlin were affected by the court's refusal to allow these to be read, so that the jury's decision or verdict in this three and one-half week trial should be reversed. Champlin could easily have questioned Olson and Carl King in the matters it wished to introduce, for example, and asked them whether they had made all these statements. But no such effort was made.

■ Champlin specifically objects to the court's refusal to permit the deposition of Olson to be read into evidence for the purpose of showing the invalidity of statements made during that deposition. However, Champlin could have questioned Olson on this matter and then used Olson's deposition for impeachment purposes inasmuch as the trial court expressly stated that it would permit those depositions to be used for such purposes. We fail to see why this court should reverse a decision in favor of Champlin's opponents merely because Champlin insists that it should have been allowed to utilize its own method of getting its point across, when another, at least equally effective method of getting that same point across was easily available.

Turning now to Champlin's claims of error having to do with the refusal of the trial court to admit other testimony in evidence, we find no merit whatsoever to any of Champlin's contentions. Many of Champlin's allegations of error go to evidence it wished to present in order to rebut claims of predatory pricing or refusal to deal, which were irrelevant to the issue at trial. There are some contentions that were raised by Champlin which deserve mention. These are:

■ First, Champlin maintains that error was committed by the trial court in failing to allow it to present evidence to prove its economic incapacity to rig the market. However, since market power is not relevant to a price fixing case under § 1 of the Sherman Act, the trial court did not err in refusing to admit such evidence. *United States v. McKesson & Robbins, Inc.*,

tions. Atlas then interrogated Pursche, covering various matters appearing in the deposition and his testimony concerning them, and at no time did Atlas offer to prove that Pursche's testimony at the trial fell short of any appearing in the depositions. 28 U.S.C.A. § 2111; *McKee v. Jamestown Baking Co.*, 198 F.2d 551 (3rd Cir. 1952); *Watts v. Holland*, 153 F.2d 337 (9th Cir. 1946); *Davis v. R. K. O. Radio Pictures*, 191 F.2d 901 (8th Cir. 1951).

300 F.2d at 488.

It should be said, thus, that the Ninth Circuit was very careful to point out that the trial judge has discretion with respect to acceptance of such depositions. If it were a short deposition that contained a clear cut admission, it would be plain error, no doubt, to refuse to accept it because its relevancy would be apparent. In the case at bar, however, counsel just wished to offer the depositions lock, stock and barrel, which is one other reason justifying the failure to accept them. In any event there is a good deal of justification for rejecting the tender inasmuch as there was no way for the court to know, without the aid of counsel, which parts were material or useful. Thus, this matter should be resolved in the case at bar the same way it was resolved in *Pursche*.

351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. Socony Vacuum Oil Co., supra,* 310 U.S. at 224, n. 59, 60 S.Ct. at 845, n. 59.

Second, Champlin alleges that it was erroneously prevented by the trial court from refuting King's allegations of causation between Champlin's illegal activities and King's inability to sell at its optimum price. We will address the two major contentions individually:

1) Jeff Smythe prepared an exhibit which attempted to show that King did not reduce prices to meet Champlin's prices, but that King reduced its prices below Champlin's prices. This exhibit prepared by Smythe, however, did not state the prices which Champlin's dealers were charging. That exhibit merely stated the prices that Champlin supposedly recommended to its dealers. The exhibit did not state what the actual sales prices were at the Champlin stations. Hence the trial court held that the comparative study failed to show what it purported to show and was thus misleading. The exhibit was actually comparing actual prices of King against theoretical or recommended prices of the Champlin dealers. Inasmuch as the Champlin dealers were shown to have been free to charge any price without following the recommended price, the court felt the exhibit was prejudicial and misleading. The court instructed defense attorneys that they were free to submit the exhibit in another form (i. e. so that the exhibit stated, without being misleading, what it was actually comparing.) This, however, the defense lawyers refused to do.

■ The court did not abuse its discretion in refusing to admit the exhibit since it was misleading, especially since the court told defense counsel that it was free to present the exhibit in another, non-misleading form.

2) Sam Olson kept a diary recording price changes at the King stations and the reasons therefor. Defense witness Mickey Bowles prepared two exhibits which involved an analysis of that diary and purported to demonstrate that King only rarely reduced its prices to meet prices set by Champlin. The exhibits were objected to by plaintiff's counsel on the grounds that they only covered nine months of the forty month damage period, and as such were merely cumulative since the entire Olson diary had been admitted into evidence, and that the documents could only compare actual prices charged by King with prices recommended by Champlin, since Mr. Bowles had already testified there were no records indicating actual selling prices of Champlin dealers. The objection was sustained.

■ We agree that the trial court acted within its discretion in refusing to admit these exhibits. Moreover, since the entire Olson diary, containing the same information, had been admitted into evidence, we fail to see how the exclusion was prejudicial to the defendant.

Third, Champlin maintains that the majority of King's claims were for damages for injuries suffered when Champlin had caused prices of gas to be lower than normal, whereas Entriken's testimony of price fixing went to efforts of Champlin to raise the prices of gas. King, however, alleged a complete scheme on the part of Champlin and its co-conspirators to fix prices. The issue was not purely a matter of lowering or increasing prices. The scheme involved both, first lowering the prices and later raising the prices in order to keep King off-balance and to prevent him from charging optimum prices for gas. While the direct evidence of price fixing went to the raising of prices, the circumstantial evidence was more than sufficient to raise the inference that the price fixing conspiracy involved the entire scheme. Champlin was, of course, free to present to the jury, by proper trial techniques, its theory that King had not suffered any damages by virtue of Champlin's efforts to fix prices.

Champlin states in its brief that it was precluded from reading Champlin's deposition testimony to the effect that the elimination of depressed prices would help, rather than hurt, King. All this testimony was not excluded. King was asked questions on the very topic at trial. He answered those

questions and parts of his deposition were read at trial.

Finally, Champlin maintains that the trial court erred in refusing to allow it to question witnesses as to the truthfulness of another witness's testimony. The trial court indicated that in the interests of time it would be preferable for Champlin to question the witnesses on the subject matter itself, and then point out the contradictions. Champlin could have done this, or, in the alternative, could have merely rephrased the questions presented to the witnesses rather than ask them if, when such and such a witness said so and so, was that witness lying? We fail to see that Champlin's substantive rights were prejudiced by the trial court's refusal to allow him to ask questions in that form.

Our conclusion is that Champlin's claims of error due to the use of depositions and other evidence do not constitute grounds for reversal.

The judgment of the district court is, therefore, affirmed in part, and reversed in part. The $2,267,826 treble damages award is reduced to $1,360,770.