The judgment of the Bankruptcy Appellate Panel is AFFIRMED.

Clair OLSEN and Guitar City Studios, Inc., a Utah Corporation, Plaintiffs-Appellants,

v.

PROGRESSIVE MUSIC SUPPLY, INC.; Norlin Music, Inc., formerly Chicago Musical Instruments; and Peavey Electronics, Inc., Defendants-Appellees.

Nos. 82–1357, 82–1400.

United States Court of Appeals, Tenth Circuit.

March 8, 1983.

---

Edward T. Wells and W. Andrew Clawson of Summerhays, Runyan & McLelland, Salt Lake City, Utah (Lowell V. Summerhays, of Summerhays, Runyan & McLelland, Salt Lake City, Utah, on brief), for plaintiffs-appellants.

Stephen G. Crockett, of Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah, for defendant-appellee Progressive Music Supply, Inc.

Bryce E. Roe, of Roe & Fowler, Salt Lake City, Utah, for defendant-appellee Norlin Music, Inc., formerly Chicago Musical Instruments.

Curtis L. Frisbie, Jr., of Gardere & Wynne, Dallas, Tex. (Mark W. Bayer, of Gardere & Wynne, Dallas, Tex., with him on brief), for defendant-appellee Peavey Electronics, Inc.

Before McWILLIAMS, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The plaintiff Olsen does business as Guitar City Studios, Inc., and he brings this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 2(e) of the Clayton Act, 15 U.S.C. § 13(e).

Named as defendants in Olsen's complaint and amended complaint are Progressive Music Supply, Inc.; Acoustic Control Corporation; Ovation Instruments, Inc. (a/k/a Kaman Corporation); Norlin Music, Inc. (formerly Chicago Musical Instrument Company); CBS Musical Instruments (a division of CBS, Inc.); ARP Instruments, Inc.; and Peavey Electronics Corporation.

The claims against ARP and CBS have been dismissed. Also, Judge Anderson, the trial judge, granted several of the defendants' motions to dismiss on behalf of claims against Norlin, Ovation, Acoustic and Peavey. Olsen's Section 2 Sherman Act claims against Progressive involving an attempt to monopolize and conspiracy to monopolize were also dismissed.

Finally, the court found that there were only two counts on behalf of the appellants which had merit. First, the court determined that Progressive had conspired to restrain trade in violation of Section 1 of the Sherman Act. The court, however, found that Olsen had suffered no injury as a result of this conspiracy, and so the court concluded that Olsen was not entitled to damages based on this conduct. Second, the court held that Progressive had violated Section 1 of the Sherman Act by conspiring to boycott Olsen from receiving CBS products. Damages were found to total $4,303, which, after trebling, amounted to $12,909.

I.

FACTUAL BACKGROUND

Olsen was and is engaged in the retail sale of musical instruments in the Salt Lake

City, Utah area. During the period commencing in 1964 and continuing to 1975, Olsen's business was conducted under the name of "Guitars, Inc.," a Utah corporation. One of the several people associated with Olsen in this venture was George Best. Until 1970, Olsen operated an outlet at Kaysville, Utah, and Best operated an outlet at Bountiful, Utah. Guitars, Inc. ordered instruments for both stores, paid half of the telephone bills of each store, and held the franchises in its name. The proceeds from sales by the stores were forwarded to Guitars, Inc. After the bills were paid, those proceeds were divided among Olsen, Best and a associate named Steven Hight.

During the year 1970 there was a disagreement between Olsen and Best, and they executed a separation agreement which essentially terminated all business relations between them, and then each began conducting his own business operation, essentially as sole proprietors of each store. Guitars, Inc. still served as a purchasing entity. Following this division, Best entered into a brokerage agreement with the defendant Progressive Music Supply, Inc., which is said to be one of the largest retail music instrument dealers in Utah.

In February of 1975, Olsen formed a new corporation, Guitar City Studios, Inc., and during the time leading up to that several changes were made in Olsen's business. Prior to 1974, Olsen had operated his Kaysville store on a part-time basis. In 1974 he moved his location and commenced business full-time. Olsen had also added a repair service to his business.

Following the changes made in his business operations, Olsen's sales increased dramatically. Prior to 1974 he sold about 7% of the volume that was sold by Progressive, the market leader in Utah. After changing his business to a full-time operation, Olsen's sales rose, until in 1977, they were approximately 70% of Progressive's sales.

After Best entered into the brokerage agreement with Progressive in 1971, Olsen maintained that he had difficulties in obtaining musical instruments from various manufacturers. The defendant manufac-

turers involved in the present litigation were willing to make Olsen a dealer, but later refused to sell to Olsen, due to commitments to Progressive. This is according to Olsen's allegations. Olsen maintains that he was thus forced to obtain or bootleg instruments through other dealers at higher costs, and that this caused actual financial loss. As a result, in April of 1975, Olsen and Guitar City Studios, Inc., brought suit against Progressive and six manufacturers.

The case, based upon Section 1 of the Sherman Act, alleges that Progressive conspired separately and jointly with each manufacturer to fix prices, establish Progressive as each manufacturer's exclusive dealer in the state of Utah, terminate Olsen's dealing in each manufacturer's products (except as against Peavey), and boycott Olsen's business. A further complaint on behalf of Olsen was that Progressive conspired with certain unnamed co-conspirators, for example, George Best, CBS Musical Instruments (CBS) and Bobbie Herger (owner and operator of Herger's Music Store in Provo, Utah), in violation of Section 1 of the Act. Olsen asserts that Progressive conspired with Best to cause Olsen to lose franchises, to destroy his credit and business reputation, to take over his business location and terminate his corporate charter, to fix prices, and to cause manufacturers to boycott his business. Further allegations by Olsen as against Progressive and CBS were that, with the help of Herger, they conspired to establish Progressive as CBS's exclusive dealer for the state of Utah, to fix prices, to terminate Olsen as a CBS dealer, to boycott Olsen's business and to cause CBS to require other dealers not to sell CBS products to Olsen. Olsen's final allegation is that the defendants conspired together to boycott Olsen and to attempt to monopolize the Utah market in certain musical instruments.

## II.

## THE CLAIMS AGAINST NORLIN, OVATION AND PEAVEY

These named defendants are shown to be manufacturers of musical instruments. As

to Norlin, there were a total of sixteen charges of unfair practices and competition. As to Ovation, there were four such charges, and as to Peavey, there were three such charges. There was also a general allegation against Norlin, Ovation, Peavey and others that they had conspired together to boycott Olsen and had conspired to create a monopoly on behalf of Progressive. Following the presentation of the evidence, the defendants moved for dismissal based upon insufficiency of the evidence. The court said that Norlin had refused to deal with Olsen only as a business convenience, and not for any anti-competitive purpose. Also the trial court determined that Norlin had not committed the anti-competitive acts alleged by Olsen, and that Norlin treated Olsen and Progressive similarly.

As to Ovation, the court, upon weighing the evidence, concluded that Ovation had not violated any of the sections of the Sherman Act.

Finally, with respect to Peavey, the trial court weighed the evidence and the inferences to be drawn therefrom and reached the conclusion that Peavey had not conspired with any other defendant contrary to Section 1 of the Sherman Act. And, according to the court, Peavey had not conspired to fix prices or to create a monopoly on behalf of Progressive.

We conclude that the trial court was correct in making these rulings.

### III.

### DISMISSAL OF OLSEN'S CLAIMS AGAINST NORLIN, OVATION AND PEAVEY

■ In reviewing the propriety of the rulings, we are governed by the clearly erroneous test. Fed.R.Civ.P. 41(b), 52(a). *See Blankenship v. Herzfeld,* 661 F.2d 840, 845 (10th Cir.1981); *and see Woods v. North American Rockwell Corp.,* 480 F.2d 644, 645–46 (10th Cir.1973).

It is Olsen's position that when a 41(b) motion is imposed in an anti-trust case, the evidence must be viewed in a light most favorable to the plaintiff. In light, how-

ever, of *Blankenship,* which also involved such a motion in a private anti-trust case, it would appear that Olsen's view is unfounded. *See also Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 676 (9th Cir.1975), which said: "[t]he fact finding process under a Rule 41(b) motion calls for an adjudication upon the merits of the plaintiff's claims and may involve a weighing of the evidence as it stands at the close of the plaintiff's case."

The district court drew permissible inferences based upon the record evidence. Moreover, as this court held in *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1148 (10th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978), "[a] choice between two permissible views is not 'clearly erroneous.'"

### IV.

### DID THE TRIAL COURT ERR IN DISMISSING OLSEN'S SECTION 2 SHERMAN ACT ATTEMPTED MONOPOLIZATION CLAIM AGAINST PROGRESSIVE?

Olsen argues that Progressive attempted to monopolize the Utah retail market in quality synthesizers, quality amplifiers and quality electronic and acoustic guitars. "Quality" was defined as guitars and amplifiers retailing for over $300 and synthesizers retailing for over $700.

■ To support a claim based on an attempt to monopolize plaintiffs are required to establish several items. First, they must demonstrate a dangerous probability of success. *Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). Second, plaintiffs must prove acts in furtherance of the attempt, although these acts need not be successful. *Lorain, supra,* 342 U.S. at 153, 72 S.Ct. at 186. Third, plaintiffs must demonstrate specific intent to monopolize. *Times Picayune Publishing Co. v. United*

**437**

*States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *E.J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 306 (10th Cir.1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976). Fourth, a relevant market, within which the attempted monopolization occurred, must be established.[1]

The district court dismissed Olsen's attempted monopolization claim because of its failure to establish two of the aforementioned requisites, to-wit, dangerous probability of success and relevant market.

With regard to dangerous probability of success the district court said:

> [P]laintiff's own expert, Mr. Scott Lloyd, testified that the information submitted in this case did not show Progressive's percentage share of the market. Without this, the court is unable to make any finding as to the dangerous probability that Progressive could monopolize the market.

■ A review of the record reveals that there was no such dangerous probability of monopolization by Progressive. In fact, Progressive's efforts to control market share by causing manufacturers not to ship products to Olsen were consistently thwarted by Olsen's ready resort to an alternative source of supply: other dealers. The likelihood that monopolization would occur was very remote because Olsen showed himself to be a very aggressive competitor.

■ With regard to Olsen's failure to establish a relevant market, the district court stated that Olsen had failed to prove a relevant product market "composed of a unique set of products, distinguishable from products selling for less money. In short, the plaintiffs failed to show that the products included in the market definition were not 'reasonably interchangeable' and competitive with less expensive products." (Quoting *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Due to the fact that a "sufficiently discrete and separable product market" had not been defined, the trial court concluded that it could not "gauge the defendants' potential for inflicting economic harm."

■ Even if Olsen had adequately delineated a relevant product market, he nevertheless failed to prove that Progressive had a controlling position in that market. Indeed, the absence of proof of market share was emphasized throughout the record.

Olsen contends, however, that evidence of market share was introduced, namely, Utah sales of CBS Fender and Rhodes products. This contention is misleading. It was introduced not to demonstrate market share, but rather to show that Progressive was "cherry-picking", that is, picking a manufacturer's type "A" product without having to pick and promote his full line. Moreover, the exhibit offered by Olsen as proof of market share concerns but a subset of the relevant product market in issue. The relevant product market was all quality guitars, amplifiers, and synthesizers. The CBS sales study offered by Olsen encompasses, of necessity, only CBS products. Therefore, it cannot serve as evidence of market share. To be sure, the study could, after a few calculations, yield evidence of total market share if CBS's own share of the Utah market had been established, which it was not. Olsen's expert witness responded "No" to the following questions: "Can you give me an approximation that CBS had 30 percent of the market, 10 percent of the market in 1974 or 70 percent? Can you tell me that far?"

---

1. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975); *Bonne Bell, supra,* at 305; *George R. Whitten, Jr., Inc. v. Paddock Pool Builders*, 508 F.2d 547, 550 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Acme Precision Prods., Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1240 (8th Cir.1973); *Bernard Food Indus., Inc. v. Dietene Co.*, 415 F.2d 1279, 1284 (7th Cir.1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); *United States v. Chas. Pfizer & Co.*, 245 F.Supp. 737, 739 (E.D. N.Y.1965); *Becker v. Safelite Glass Corp.*, 244 F.Supp. 625, 637 (D.Kan.1965). *But see, Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) ("the relevant market is 'not in issue' in an attempt or conspiracy to monopolize case").

In light of the foregoing, we conclude that the trial court's findings were not clearly erroneous. Accordingly, the dismissal of Olsen's attempt to monopolize claim should be affirmed.

## V.

### DID THE TRIAL COURT ERR IN DISMISSING OLSEN'S SECTION 2 SHERMAN ACT CONSPIRACY TO MONOPOLIZE CLAIM AGAINST PROGRESSIVE?

■ The elements needed to establish conspiracy to monopolize are as follows:

First, the existence of a combination or conspiracy to monopolize. *American Tobacco, supra,* 328 U.S. at 788, 66 S.Ct. at 1128.

Second, overt acts done in furtherance of the combination or conspiracy. *Cullum Elec. & Mechanical, Inc. v. Mechanical Contractors Ass'n. of South Carolina,* 436 F.Supp. 418, 425 (D.S.C.1976), *aff'd,* 569 F.2d 821 (4th Cir.1978).

Third, an effect upon an appreciable amount of interstate commerce. *United States v. Yellow Cab Co.,* 332 U.S. 218, 225, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010 (1947); *Times-Picayune, supra,* 345 U.S. at 611, 73 S.Ct. at 881.

Fourth, a specific intent to monopolize. *American Tobacco, supra,* 328 U.S. at 809, 66 S.Ct. at 1138.

■ A relevant market need not be established. *Salco Corp. v. General Motors Corp.,* 517 F.2d 567, 576 (10th Cir.1975) ("specific intent to monopolize is the heart of a conspiracy charge, and a plaintiff is not required to prove what is the 'relevant market' ").

■ The district court based its dismissal of Olsen's conspiracy to monopolize claim on two factors. First, Olsen did not establish that the conspiracy of Progressive involved an appreciable part of interstate commerce. The only part of commerce which could conceivably be affected by such activity is the CBS Fender line. Progressive already had a monopoly on that line under an arrangement which the court had previously found was not *per se* illegal under Section 1.

The trial court also dismissed Olsen's conspiracy claim on the basis that Progressive did not harbor a specific intent to obtain a complete monopoly in all lines of musical instruments. The court observed that the evidence indicated only that "Progressive held exclusive franchises on certain product lines and may have prevented others from obtaining business on those lines."

We conclude the trial court's findings were not clearly erroneous. The dismissal by the trial court of the conspiracy to monopolize claim is affirmed.

## VI.

### DISCUSSION OF OLSEN'S BOYCOTT THEORY

The trial court found that Progressive had conspired with CBS and Bobbie Herger to boycott Olsen, whereby he would not be able to obtain CBS products. This boycott was an element of the price fixing conspiracy also allegedly engaged in by Progressive and Herger. The trial court said, "it was necessary to boycott Olsen in order that the high prices set by Progressive and Herger could be maintained and not be undercut by Olsen."

The argument of Progressive on cross-appeal is that the trial court improperly treated the group boycott involved herein as a *per se* violation of the anti-trust laws. *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1367 (5th Cir.1980). Progressive contends that a group boycott is not deemed a *per se* violation if it is "at least potentially reasonably ancillary to joint, efficiency-creating economic activities." (Quoting *Realty Multi-List, supra* ).

■ In this case there is evidence that there was a boycott which was "clearly exclusionary or coercive in nature." *Gould v. Control Laser Corp.,* 462 F.Supp. 685, 691 (M.D.Fla.1978), *aff'd,* 650 F.2d 617 (1981). Thus, the case differs from those in which "courts have circumvented the rigidity of the *per se* rule by reasoning that the need

for its application 'depends not upon a finding that * * * [a restraint] constitutes a "boycott" but upon an analysis of its purpose and competitive impact.' " Note, The Facial Unreasonableness Theory: Filling the Void Between Per Se and Rule of Reason, 55 St. John's L.Rev. 729, 750 n. 155 (1981) (quoting *Gould, supra,* at 691). Pro-competitive impacts or motives within the trial court's findings are difficult to see. For instance, Herger boycotted Olsen because "she had an independent prejudice against giving competitive dealers large discounts." In addition, Progressive harbored a "predatory intent toward competing dealers."

From the findings it would appear that the boycott engaged in by Progressive was *per se* violative of the anti-trust laws. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (*per se* violation of Sherman Act exists when department store conspires with appliance manufacturers and distributors to prevent sales to small retail appliance stores).

Based upon the proposition that Progressive had violated Section 1 of the Sherman Act by conspiring to boycott Olsen from receiving CBS products, the trial court assessed damages at $4,303 before trebling. In calculating these damages, 1975 was used as a base year but by that time the boycott had terminated, thus giving Olsen free access to CBS products. The damage study employed by the court then projected backwards from 1975 to estimate the amount of damages that the boycott had caused. More specifically, the study reduced Olsen's total retail CBS sales for 1975 (stipulated to be $27,000) to a wholesale price figure, compared this figure with equivalent figures for CBS dealers in the state to determine Olsen's share of the CBS market in Utah for 1975, and then calculated the amounts Olsen would have earned if he had enjoyed the same market share in previous years. The projections of market share were reduced by 30%, however, to account for changes in Olsen's business operations, between 1971–1974 and 1975. The preceding damage analysis as worked out by the court is appended to this opinion.

The court determined that Olsen had suffered net lost profits of $4,303 from the years 1971 to 1974. Pursuant to 15 U.S.C. § 15, this figure was trebled to $12,909.

The calculations were derived, with one significant exception, from a damage study introduced into evidence by Olsen. The exception was that, unlike the damage study, the court did not assume that Olsen's increase in market share in 1975 (the base year) was due solely to the termination of the boycott. The court noted that in 1975, "Olsen was operating in a substantially different mode than during most of the damage period." Olsen had converted from a part-time to a full-time business and had, by moving to a larger store, doubled his floor space. Accordingly, the court diminished the 1975 sales base by 30% to reflect the role of the extra hours and space.

On appeal, Olsen argues that the damages awarded were too low, while Progressive asserts that the evidence does not sustain any award for damages. Olsen's first contention is that the 30% reduction is improper. Olsen argues that he would have moved and switched to full-time operations well before 1975 if the boycott had not been in effect. For that he maintains that it was wrong for the trial court to reduce damages in an arbitrary manner on account of Olsen's very failure to move.

The trial court considered as "too speculative" Olsen's contention that he would have altered his business operations but for the boycott. It is true that a plaintiff in an anti-trust case should "not be held to a rigid standard of proof regarding the amount of damages, since in such cases economic harm is frequently intangible and difficult to quantify." *King & King Enterprises v. Champlin Petroleum Corp.,* 657 F.2d 1147, 1157 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–65, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). On the other hand, "damages may not be merely speculative." *King & King, supra.*

■ Evidence in the record provided a reasonable basis for the court's determination. That is that Olsen's failure to alter his business operations in 1971–1974 was not due to his inability to obtain musical instruments. Olsen testified that, except for several delays which could well have been caused by order backlogs, he was able to obtain instruments from other dealers, if not from the manufacturers themselves. Also, Olsen was employed during that period by the Federal government. As this employment provided the bulk of Olsen's income, it is reasonable to conclude that the fear of losing a secure source of income, as opposed to an inability to obtain musical instruments, prevented Olsen from taking up his music store business on a full-time basis.

■ Olsen also contends that the trial court was incorrect in applying a 30% reduction formula. According to Olsen, the reduction should have been applied only to estimated 1971–1974 sales, not to actual sales.

However, Olsen's math is wrong. The 30% reduction considers the fact of reduced floor space and selling time in the years 1971–1974 (as opposed to the base year of 1975). Floor space and selling time is essential to sales of actual and hypothetical musical instruments. Space and time devoted to hypothetical sales cannot be devoted to actual sales. Accordingly, the 30% reduction in both actual and estimated sales does not seem unreasonable in order to deal with Olsen's change in business operations between 1971–74 and 1975.

■ Progressive argues on cross-appeal that the evidence cannot sustain an award of damages to Olsen of any amount. The trial court, however, gave careful scrutiny to the entire picture and had no trouble finding that Olsen had sustained his burden of proof as to injuries suffered. The court said that "[i]nferences can be drawn that the boycott conspiracy foreclosed at least two avenues of supply, Herger and Browne

[owner and operator of California Musical Instruments], from which injury occurred." The trial court also concluded that Progressive had not established that other sources of supply fully compensated for the foreclosure of Herger and Browne.

In view of these findings, this court should uphold the award of damages. *See King & King, supra,* at 1158 ("once there is found to be sufficient factual evidence of damages, the plaintiffs are not obligated to establish the quantum of damages 'with mathematical precision.'") (quoting *Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242, 246 (10th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977)). *See also Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 484 (7th Cir.1980); *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 509 F.2d 784, 792–93 (5th Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 59, 46 L.Ed.2d 52 (1975); *Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.,* 346 F.2d 661, 666 (6th Cir.), *cert. denied,* 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965).

## VII.

## DID THE TRIAL COURT ERR IN DENYING OLSEN'S PRICE FIXING CLAIM?

The trial court found that Progressive and Herger had agreed to divide territories and to fix high retail prices on CBS products in violation of Section 1 of the Sherman Act. The trial court, however, refused to award damages on this conduct, based upon its conclusion that the conspiracy had not damaged Olsen. The court observed that "[l]ogically, the higher the prices set by Herger and Progressive, the easier it was for Olsen to compete in the Utah retail market for CBS products."

■ High fixed prices might facilitate the entrance of new competitors into a relevant product market, or may help the competitive position of sellers not participating in the price fixing conspiracy. Nevertheless, it is clear that such beneficial features

cannot render a price fixing conspiracy immune from anti-trust attack. *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 650, 100 S.Ct. 1925, 1929, 64 L.Ed.2d 580 (1980). Indeed, price fixing agreements are *per se* violative of Section 1 of the Sherman Act. *Catalano, supra,* at 648, 100 S.Ct. at 1928; *United States v. Container Corp. of America,* 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 844–45 n. 59, 84 L.Ed. 1129 (1940); *King & King, supra,* 1151.

█ However, the violation should not give rise to "double liability trebled." *City and County of Denver v. American Oil Co.,* 53 F.R.D. 620, 631 (D.Colo.1971). Olsen's price fixing damage theory would do just that. Olsen's damage calculations are as follows:

| | | |
|---|---:|---|
| Progressive's CBS market 1971–1974 from the business records of CBS and Progressive | $297,709 | 1 |
| Guitar City 70% of Progressive's CBS market, but for the conspiracy | 208,396 | 2 |
| Wholesale of Guitar City CBS market at benchmark, 50% of list price | 104,198 | 3 |
| Guitar City retail sales CBS 70% market, at their normal discount, or 85% of list | 177,137 | 4 |
| Guitar City gross profit CBS 70% market, line 4 minus line 3 | 72,939 | 5 |
| Minus 10.65% variable overhead expenses, of line 2 | 22,194 | 6 |
| Minus awarded boycott damages | 4,303 | 7 |
| Net economic loss | 46,442 | 8 |
| Trebled damages | 139,326 | 9 |

The weakness of this formula is that it compensates for the same transactions that have already been addressed by the trial court's award of boycott damages. Line 2 of the derivation assumes that Olsen would have had 70% of Progressive's CBS market but for the conspiracy. An identical assumption, although phrased in terms of Olsen's potential share of the entire Utah CBS musical instrument market (as opposed to his share of Progressive's market) was made with respect to Olsen's boycott' damages (see line 4 of trial court's boycott damage formula). So, therefore, the same injury is being counted up twice. Accordingly, the trial court properly declined to award both boycott and price fixing damages where they stemmed from the same transactions.

## VIII.

## WHAT ABOUT THE CONTENTION THAT SOME OF THE MORE SIGNIFICANT TRIAL TRANSCRIPTS WERE MISSING?

█ Olsen asserts on appeal that trial transcripts which were favorable to his position were not before the trial court during the decision making process. Thus, according to Olsen, the court failed to make certain findings, made erroneous findings, failed to understand Olsen's economic theories, failed to award price fixing damages, failed to award reasonably proved boycott damages, and failed to draw inferences in favor of Olsen.

Almost every page of the neglected transcripts contains testimony which the trial court was privy to during each and every day of the trial below. This element, plus the fact that the court had available to it the bulk of the trial transcripts, all of the pleadings and all of the trial exhibits, certainly gave the court the basis for reaching an accurate conclusion. A careful review of the neglected transcripts does not reveal reversible error by the trial court. *See United States v. Lee,* 622 F.2d 787, 791 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981) (although the district court failed to review the entire record, it had "adequately informed itself of the record * * * to make the determination required"); *Simpson Bros. v. District of Columbia,* 179 F.2d 430, 436 (D.C.Cir.1949), *cert. denied,* 338 U.S. 911, 70 S.Ct. 350, 94 L.Ed. 561 (1950) (although the district court had not read all the pleadings in the case, "the record * * * and the opinion of the district court show that by the end of the hearing on the motions for summary judgment the court was acquainted with the issues in the case and that the conclusion

reached by the court was—in view of all the pleadings, deposition, affidavits and authorities—correct.").

Olsen maintains on appeal that certain evidence was improperly excluded from the record. Progressive claims that other testimony was improperly received into evidence. The trial court's rulings on these matters did not prejudicially affect the outcome of the litigation. See *Union Carbide and Carbon Corp. v. Nisley,* 300 F.2d 561, 586 (10th Cir.1961), appeal dismissed, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962); Fed.R.Civ.P. 61.

In light of what appears above, it is the conclusion of this court that the judgment of the trial court should be and it is hereby affirmed.

## APPENDIX