**BY–RITE DISTRIBUTING, INC. a Utah corporation, Plaintiff,**

v.

**The COCA–COLA COMPANY, PepsiCo, Inc., Sunkist Soft Drinks, Inc., Admiral Beverage Corp., Seven-Up USA, Inc., Seven Up Bottling Company of Salt Lake City, a Utah Corporation, N.V. Swire Bottlers, Inc., a Netherlands Antilles corporation, d/b/a Swire Bottlers, Inc., Coca-Cola Bottling Company of Salt Lake, Dr. Pepper Bottling Company of Salt Lake, Coca-Cola Bottling Company of Provo, and Richfield Coca-Cola Bottling Company, and Does 1 through 10, Defendants.**

Civ. A. No. C–83–0956W.

United States District Court,
D. Utah, C.D.

Dec. 12, 1983.

---

Robert E. Froerer, Ogden, Utah, for plaintiff.

Richard W. Giauque, Jay D. Gurmankin, Wendy A. Winterholler, Salt Lake City, Utah, Frank C. Jones, Joseph R. Gladden, L. Joseph Loveland, Atlanta, Ga., for defendants Coca-Cola.

C. Keith Rooker, Patricia W. Christensen, Salt Lake City, Utah, Richard M. Steuer, New York City, for defendant PepsiCo, Inc.

Gifford W. Price, Salt Lake City, Utah, David R. Aufdenspring, Atlanta, Ga., for defendant Sunkist.

Keith E. Taylor, Raymond J. Etcheverry, Kent O. Roche, Salt Lake City, Utah, Edward W. Rothe, Chicago, Ill., for defendant Seven Up.

Merlin O. Baker, Salt Lake City, Utah, Harry L. Hobson, John Vaught, Denver, Colo., for defendant Admiral Beverage Corp.

David A. Greenwood, Salt Lake City, Utah, for defendant N.V. Swire Bottlers.

## INTRODUCTION

WINDER, District Judge.

This action involves the issues of whether By-Rite Distributing, Inc. ("By-Rite") is entitled to sell, or encourage and facilitate the sale of, defendants' fountain soft drinks in two-liter PET plastic bottles or other containers intended for later consumption through its Carb-A-Drink Self-Service Beverage Stations and whether the defendants are obligated to sell their fountain syrups to By-Rite for this purpose.

This case was brought by By-Rite against The Coca-Cola Company, PepsiCo, Inc. ("PepsiCo"), Sunkist Soft Drinks, Inc. ("SSD"), The Seven-Up Company ("Seven-Up"), Admiral Beverage Corp. ("Admiral"), Seven-Up Bottling Co. of Salt Lake City ("Seven-Up SLC"), and N.V. Swire Bottlers, Inc. ("Swire") charging violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Robinson-Patman Act, 15 U.S.C. § 13, and Utah state law. The Coca-Cola Company, PepsiCo, Seven-Up, and SSD (collectively "counterclaiming defendants") each filed counterclaims charging that By-Rite was violating their rights under federal and state trademark law and the state law of unfair competition. By-Rite, The Coca-Cola Company, PepsiCo, and SSD each moved for preliminary injunctions, with By-Rite seeking an order requiring defendants to supply By-Rite with fountain syrups at specified prices, and said defendants seeking an order enjoining By-Rite from continuing to sell their trademarked products in bottles or other containers intended for storage and later consumption. Seven-Up's counterclaim prayed for a declaratory judgment seeking to impose on By-Rite the restriction that Seven-Up's fountain syrups be used only in sanitary, single-use containers designed for immediate consumption and not for bottling or storage. Pursuant to Rule 57, F.R.C.P., the Court ordered a speedy hearing on Seven-Up's counterclaim and advanced it on the calendar.

A hearing was held on the motions for preliminary injunctions and Seven-Up's counterclaim on October 12–17, 1983, during which the Court heard testimony offered by all sides. Additional evidence was submitted, pursuant to the Court's instructions, by affidavit and deposition, with opposing counsel afforded the right to cross-examine the affiants. Thereafter, the defendants seeking a preliminary injunction submitted their proposed joint Findings of Fact and Conclusions of Law on November 9, 1983 and the plaintiff submitted its objections thereto on November 21, 1983. The Court has now considered the foregoing and hereby entered the following, which constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *Parties*

1.

By-Rite is a Utah corporation with its principal offices located in Ogden, Utah. By-Rite is engaged in several businesses, including the wholesale marketing of petroleum products, the ownership and operation of retail gasoline and convenience

stores, and the operation and sale of self-service fountain soft drink dispensing systems under the name "Carb-A-Drink Self-Service Beverage Stations" ("the Carb-A-Drink system").

2.

Defendant The Coca-Cola Company is a corporation organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. The Coca-Cola Company is a manufacturer of syrups, concentrates, and beverage bases used in the production of soft drink beverages, including Coca-Cola, Tab, Sprite, Diet Coke, the Fanta flavors, Ramblin' Root Beer, and others. The Coca-Cola Company owns a number of registered trademarks for syrups and the soft drinks produced from these syrups, including COCA–COLA, COKE, FANTA, SPRITE, MELLO YELLO, TAB, RAMBLIN', HI–C, and FRESCA.

3.

Defendant PepsiCo, Inc. ("PepsiCo") is a corporation organized under the laws of the State of Delaware with its principal place of business in Purchase, New York. PepsiCo manufactures soft drink concentrates which are used in the production of certain soft drinks, including Pepsi-Cola, Diet Pepsi, Pepsi Light, Pepsi Free, Mountain Dew, and Teem. PepsiCo owns a number of registered trademarks for these concentrates and the soft drinks produced from them, including PEPSI–COLA, PEPSI, DIET PEPSI, PEPSI LIGHT, MOUNTAIN DEW, and TEEM.

4.

Defendant Sunkist Soft Drinks, Inc. ("SSD") is a corporation organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Pursuant to a Trademark License Agreement from Sunkist Growers, Inc. to SSD, under which SSD is licensed to use the registered trademark SUNKIST and other marks, SSD is responsible for the marketing of Sunkist Orange Soda nationwide.[1] SSD's failure to perform its obliga-tions under the Trademark License Agreement could enable Sunkist Growers, Inc. to terminate the Trademark License Agreement.

5.

Defendant the Seven-Up Company ("Seven-Up") is a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Seven-Up is engaged in the manufacture and sale of syrups and concentrates used to produce soft drinks, including Seven-Up and Like Cola.

6.

Defendant Admiral Beverage Corp. ("Admiral") is a corporation organized under the laws of Wyoming with its principal place of business in Worland, Wyoming. Admiral is engaged in the sale and distribution of canned soft drink products in the states of Utah, Montana, South Dakota, Idaho, and Wyoming. Admiral does not sell fountain soft drink syrups.

7.

Defendant Seven-Up Bottling Company of Salt Lake City ("Seven-Up SLC") is a Utah corporation with its principal place of business in Salt Lake City. Seven-Up SLC is licensed by Seven-Up to manufacture, sell, and distribute bottled Seven-Up soft drink products and Seven-Up fountain syrups. Seven-Up SLC is also licensed to manufacture, sell, and distribute bottled Sunkist soft drink products and Sunkist soft drink fountain syrup.

8.

Defendant N.V. Swire Bottlers, Inc. ("Swire") is a Netherlands Antilles corporation which does business in Utah as, *inter alia*, Swire Bottlers, Inc., Coca-Cola Bottling Company of Salt Lake, Dr. Pepper Bottling Company of Salt Lake, Coca-Cola Bottling Company of Provo, and Richfield Coca-Cola Bottling Company. Swire is a bottling company authorized by The Coca-Cola Company pursuant to written con-

---

**1.** In references below to "the counterclaiming defendants' trademarks" and the like, it should be noted that Sunkist Growers, Inc. is the owner of the registered trademark SUNKIST, and such references are used simply for ease of expression.

tracts as the exclusive bottler of certain soft drinks produced from syrups manufactured by The Coca-Cola Company in specific territories and Swire is given the exclusive right to use certain of the trademarks of The Coca-Cola Company in connection with such bottled soft drinks within those territories.

B. *Facts Regarding the Distribution of Soft Drink Products.*

9.

Since the turn of the century, soft drinks have been sold in this country in two forms: (1) through fountain service, where flavored syrup is mixed with water and carbon dioxide and served for reasonably immediate consumption; and (2) in bottles, and later in cans, filled and sealed by bottlers and sold primarily to retail outlets such as grocery stores for later consumption.

10.

The Coca-Cola Company, PepsiCo, Seven-Up, and SSD each have employed two separate methods of distribution for the soft drink products bearing their trademarks, one for fountain drinks and a second for bottled drinks. While there are significant differences in the methods of distribution used by these companies for their fountain syrups, in the case of bottles and cans each company relies on bottlers who, pursuant to written contracts or license agreements, have been granted the exclusive right to produce and sell bottled and canned soft drinks bearing certain of these companies' trademarks within defined territories. Seven-Up SLC and Swire each have such exclusive rights for certain products.

11.

By-Rite is not now and has never been an authorized bottler of soft drinks under a contract or license agreement with any of the defendants.

C. *Facts Regarding By-Rite Distributing, Inc.*

12.

By-Rite is presently engaged in three principal business activities. First, By-Rite owns 23 retail gasoline and convenience stores in California, Nevada, Utah, Wyoming, Idaho, and Oregon. Second, By-Rite conducts a wholesale petroleum sales operation, whereby petroleum products are sold to commercial accounts as well as other convenience stores and businesses. Third, By-Rite operates and markets the Carb-A-Drink Self-Service Beverage Stations ("the Carb-A-Drink system"), a system designed to encourage and facilitate the sale of fountain soft drinks in two-liter PET plastic bottles or other containers intended for storage and later consumption.

13.

The combination of the retail gasoline and convenience store operations and the wholesale petroleum operations have accounted for approximately 90% of By-Rite's revenues and 70% of By-Rite's profits over the last year.

14.

The first Carb-A-Drink system was installed by By-Rite at its store in Layton, Utah in August, 1982. Between that date and April, 1983, By-Rite installed the Carb-A-Drink system in four other By-Rite stores in Utah, Idaho, and California. Accordingly, eighteen By-Rite stores do not have the Carb-A-Drink system installed.

15.

The Carb-A-Drink system consists primarily of a large unit of fountain dispensing equipment, equipped with from 10 to 20 heads dispensing up to 40 flavors. The fountain heads bear the trademarks of the products dispensed, including the trademarks of the counterclaiming defendants. In addition, certain flavors are sold without trademarks. The equipment has been designed to facilitate the filling of bottles from the fountain dispensers.

16.

The Carb-A-Drink system operates in the following manner. A customer obtains an empty two-liter PET plastic bottle bearing the trademark Carb-A-Drink and fills the bottle with fountain beverage at the Carb-A-Drink station. The customer is encour-

aged to return to the store and refill the two-liter PET bottle or other package of his own at the fountain. Therefore, customers may and do fill empty bottles that bear the trademarks of one defendant with products manufactured by another company.

17.

The Carb-A-Drink system encourages consumers to fill and take home a number of two-liter bottles. By-Rite markets a six-pack carrying case for this purpose. It is the intent of By-Rite that products bottled through a Carb-A-Drink system may remain in the purchaser's possession for three weeks or possibly longer. Thus, the ultimate consumers of the products bottled through the Carb-A-Drink system are often not the individuals who purchased the products.

18.

In approximately April, 1983, By-Rite began to market the Carb-A-Drink system to other retailers, including convenience store operators and grocery stores. Since that time, approximately thirty Carb-A-Drink systems have been sold or installed by By-Rite in Utah, Idaho, Oregon, Arizona, Oklahoma, New Mexico, and North Carolina. A number of systems were sold subsequent to the demands from The Coca-Cola Company, PepsiCo, and SSD that By-Rite cease bottling their respective products and subsequent to the filing of this litigation. By-Rite continued its sale of systems even after the counterclaiming defendants had filed their motions for preliminary injunction.

19.

By-Rite sells the Carb-A-Drink fountain dispensing equipment to other retailers for an average price of $30,000 to $35,000. By-Rite realizes a gross profit of approximately 25 percent on each such sale. By-Rite also offers an optional "support program" to the purchaser, pursuant to which By-Rite supplies PET bottles, a specially designed cap for the bottles, paper funnels for filling the bottles, and cups. To date, all but one of the purchasers of the Carb-A-Drink equipment have also purchased the support program.

20.

By-Rite's promotional and marketing materials emphasize the potential for use of the Carb-A-Drink system as a bottling facility and lead purchasers of the system to believe that the Carb-A-Drink products are similar to products bottled by authorized bottlers of the counterclaiming defendants. For example, potential purchasers of the system are advised that they will be offering "the widest choice of beverages available anywhere at a price considerably less than commercially-filled bottles." Such purchasers are also asked to "imagine watching your customers walk up to a soda fountain and filling a two-liter bottle with any one of twenty (20) or more popular brand named flavors...." By-Rite's practice of selling the two-liter bottles in six-pack carriers is also likely to cause consumers to believe that the Carb-A-Drink products can be stored for extended periods before consumption.

21.

Soft drink syrups of other manufacturers who are not parties to this litigation, including Royal Crown Cola, Dr. Pepper, and Shasta have been obtained by By-Rite for use in the Carb-A-Drink system.

22.

The sale of fountain products through the Carb-A-Drink system in containers which are intended to retain carbonation and thus to facilitate storage constitutes an unauthorized bottling operation. The fact that it is the consumer who places the product in the bottle does not alter this finding.

D. *Facts Regarding The Counterclaiming Defendants Quality Control Procedures for Bottling Products*

23.

The Coca-Cola Company, PepsiCo, SSD, and Seven-Up have each established very strict quality control procedures which all authorized bottlers of their products must follow. These procedures cover virtually every aspect of the bottling operation and

are designed to insure that the bottled products will meet specifications, are safe for consumption, will retain their high quality, and will remain wholesome even after storage for several months. These stringent quality control standards for bottled products are necessary because bottled soft drinks are designed for consumption at a time significantly after the product is purchased, as contrasted with fountain soft drinks, which are intended for reasonably immediate consumption after dispensing.

24.

The counterclaiming defendants' quality control procedures and standards include specifications for carbonation levels, syrup content, brix or sweetness levels, and numerous other factors which relate to the quality of bottled products.

25.

To assure that the fountain beverage and the bottled beverage of each of the counterclaiming defendants' brands taste essentially the same at the time of consumption, it is necessary in many instances to have different carbonation levels and syrup formulations for the fountain and bottle drinks. For this reason, among others, the counterclaiming defendants do not authorize or permit the use of fountain syrups or fountain dispensers for the bottling of their products.

26.

Specifically as to SSD, the evidence is uncontroverted that SSD sells one formula of concentrate for the production of bottled and canned Sunkist Orange Soda and another formula of concentrate for the production of Sunkist Orange Soda fountain syrup. Among the reasons that SSD deems it necessary to have a different formula for the bottle and can product and the fountain product are: (i) the carbonation levels of the finished product in each case are different, and (ii) the finished bottle and can product must have a reasonable shelf life in finished form while the fountain product is designed for reasonably immediate consumption. The evidence with regard to the other counterclaiming defendants is essentially to the same effect.

27.

The quality control procedures of the counterclaiming defendants have been instrumental in establishing and maintaining the reputations of these companies for high quality bottled products. This reputation is valuable to both the counterclaiming defendants and their authorized bottlers. Thus, the counterclaiming defendants devote very substantial financial resources and personnel to monitoring the quality control operations of their authorized bottlers. Likewise, each authorized bottler must make a large investment in equipment and personnel and devote substantial resources to monitoring and maintaining the quality of bottled products.

28.

Bottled soft drinks must be manufactured under carefully controlled conditions in order to avoid the growth of bacteria, yeast and mold in the bottle, which can spoil the soft drink and are distasteful to consumers. The quality control procedures and product specifications established by the counterclaiming defendants are designed in part to prevent the growth of bacteria, yeast and mold. Compliance with these procedures and specifications requires time, effort and a large investment in the proper equipment, training procedures and personnel.

29.

The quality control standards adopted by the counterclaiming defendants are designed to maintain the consistent quality of bottled soft drinks and are therefore essential in protecting the goodwill and trademarks of the counterclaiming defendants.

E. *Facts Regarding Quality Control in the Carb-A-Drink System.*

30.

By-Rite provides no assurance that the quality or sanitation of products bottled through the Carb-A-Drink system will be equal to that of authorized bottlers. Indeed, on the packages which it provides to consumers, By-Rite disclaims any responsibility for the condition of the bottle used by

the customer and for its contents. Representatives of By-Rite acknowledged during the hearing that Carb-A-Drink bottled products sold under the trademarks of the counterclaiming defendants are not intended to match the qualities of products bottled by authorized bottlers.

31.

The PET plastic bottles used by By-Rite and other retailers operating the Carb-A-Drink system have not been approved by the counterclaiming defendants as refillable containers for soft drinks, and would not withstand the thorough cleaning procedures available in an authorized bottling plant. By-Rite makes no effort to check the condition of the plastic bottles when they are refilled through the Carb-A-Drink system.

32.

The quality of products bottled at a Carb-A-Drink station is not equal to the quality of authorized bottled products. Specifically, the Carb-A-Drink bottled products do not meet the counterclaiming defendants' product standards for proper carbonation levels, sweetness levels, syrup content, capping procedures, and cleanliness.

33.

The use of the counterclaiming defendants' trademarks in connection with the Carb-A-Drink system constitutes a representation that the products sold through the system have been subjected to and meet the same high quality and sanitation standards specified by the counterclaiming defendants for products bottled by authorized bottlers. A consumer using the Carb-A-Drink system is likely to believe, and would be entitled to believe, that the products of the counterclaiming defendants dispensed in two-liter PET bottles through the system are the same as the products produced by authorized bottlers. Because this is not the case, a significant number of consumers are likely to be confused, or possibly even deceived, as to the qualities and sponsorship of the bottled products sold through the Carb-A-Drink system.

F. *The Supply of Fountain Syrups by the Defendants to By-Rite.*

34.

By-Rite has not purchased fountain syrups directly from The Coca-Cola Company. By-Rite purchased fountain syrups from authorized wholesalers of The Coca-Cola Company's fountain syrups, pursuant to The Coca-Cola Company's System Wholesaler Program. Under this program, the selling wholesaler sets the price to be charged for syrup. The Coca-Cola Company has not, to date, refused to sell fountain syrups to those wholesalers who sell fountain syrups to By-Rite.

35.

On June 8, 1983, The Coca-Cola Company sent a letter to David Cragun, as President of By-Rite, stating that The Coca-Cola Company considered By-Rite's sale in bottles of soft drinks produced from The Coca-Cola Company's fountain syrups to constitute unauthorized bottling and demanding that By-Rite cease these activities. The evidence before the Court does not support an inference that this letter resulted from anything other than an unilateral determination by The Coca-Cola Company based on the factors set forth in the letter.

36.

PepsiCo began selling post-mix syrup to By-Rite as a National Account customer in or after September, 1982, believing that By-Rite was operating normal fountain operations selling soft drinks for immediate consumption. When PepsiCo learned that By-Rite was engaged in bottling, it halted its sales, notifying By-Rite of this decision by telephone in late June, 1983, and confirming it by a letter of July 6, 1983. PepsiCo was concerned, among other things, that By-Rite's sales of a bottled product which did not meet PepsiCo's standards, while displaying PepsiCo's trademarks in connection with these sales, constituted a violation of PepsiCo's trademark rights. PepsiCo was also concerned that the refilling of plastic bottles could create quality problems and health problems, and thereby damage PepsiCo's goodwill. The evidence before the Court indicates that PepsiCo's

decision to discontinue its sales to By-Rite was entirely unilateral and was not the result of any conspiracy, agreement or other combination.

37.

By-Rite never has purchased soft drink fountain syrups from SSD for use in the Carb-A-Drink system. By-Rite submitted an application for national account status to SSD, but that application was not approved. In response to a letter dated June 17, 1983, from By-Rite, SSD sent a letter dated July 7, 1983 to J. Craig Valentine, Operations Manager of By-Rite. The letter, in declining to grant By-Rite's application, stated that SSD was concerned with respect to the sanitization of the two-liter PET bottle and that Sunkist Orange Soda fountain syrup is formulated specifically for immediate consumption. The letter demanded that By-Rite cease and desist from dispensing Sunkist Orange Soda in bottles. The evidence before the Court does not support an inference that this letter and the decision of SSD's management resulted ·from anything other than a unilateral determination by SSD based on the factors set forth in the letter.

38.

By-Rite started to buy Seven-Up fountain syrups in June, 1983 as a result of an application to become a national account customer which represented By-Rite to be the operator of a chain of convenience stores. There was no mention of the Carb-A-Drink system; indeed, it had never been discussed with anyone from Seven-Up. Although By-Rite's complaint alleged that on August 2, 1983, Seven-Up said it was unwilling to sell its products to By-Rite at national account prices, By-Rite now admits that Seven-Up never refused or threatened to refuse to sell to By-Rite (or any Carb-A-Drink system owner) and that By-Rite always had access to Seven-Up's products at national account prices. Seven-Up learned about the Carb-A-Drink system in late July, made its own investigation, and determined that fountain syrup was being used for bottling without Seven-Up's permission or supervision to insure proper sanitation, quality, safety, and labeling. Con-

sequently, Seven-Up determined that the Carb-A-Drink system constituted an unauthorized end-use and imposed numerous risks which it is not willing to take. These determinations were made unilaterally, for sound business reasons.

39.

By-Rite never has purchased soft drink fountain syrups from Seven-Up SLC for use in the Carb-A-Drink system and no present business relationship exists between By-Rite and Seven-Up SLC. By-Rite never has requested that Seven-Up SLC sell to By-Rite any of the products which Seven-Up SLC is licensed to manufacture, sell, or distribute, at a location within Seven-Up's SLC territory. By-Rite does not operate any business location within the licensed territory of Seven-Up SLC. There is no evidence that Seven-Up SLC's refusal to sell any product to By-Rite outside Seven-Up SLC's licensed territory resulted from anything other than a unilateral business determination of Seven-Up SLC.

40.

By-Rite never has purchased soft drink fountain syrups from Admiral. By-Rite never has even requested that Admiral sell or supply soft drink fountain syrups to By-Rite. The evidence before the Court offers no support for a conclusion that Admiral is or should be vicariously liable for any conduct of its wholly-owned subsidiary, Old Faithful Beverage Co.

41.

By-Rite never has purchased soft drink fountain syrups from Swire for use in the Carb-A-Drink system. By-Rite never has even requested that Swire sell or supply soft drink fountain syrups to By-Rite for this purpose. By-Rite and Swire have had no business dealings with respect to the Carb-A-Drink system or any fountain syrups for use in connection with that system.

## II. CONCLUSIONS OF LAW

A. *By-Rite's Motion for Preliminary Injunction*

1.

By-Rite's request for a preliminary injunction requiring the defendants to sell

fountain syrups for use in the Carb-A-Drink system must be denied. In this Circuit, a preliminary injunction will be issued only if the party seeking relief establishes: "(1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest." *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980); *accord Kenai Oil & Gas, Inc. v. Department of Interior of U.S.,* 671 F.2d 383, 385 (10th Cir.1982). The Court concludes that By-Rite has not offered evidence that establishes any reasonable chance of succeeding on the merits of its claims. Having decided this question, the Court does not reach the other criteria, except as discussed in regard to the counterclaiming defendants' motions.

### 2.

■ There is no evidence to support an inference that the defendants have conspired to refuse to deal with By-Rite and the purchasers of its Carb-A-Drink system as By-Rite alleges in Count I of its Complaint. By-Rite did not offer any evidence to support this claim as to Swire, Seven-Up SLC, Seven-Up or Admiral and essentially agreed that there was no basis to enjoin these defendants. With regard to the other counterclaiming defendants, the law is clear that a manufacturer is free to decide unilaterally with whom it will do business, and a determination by a manufacturer not to deal with a party who misuses its products does not violate the antitrust laws. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d 1313, 1318 (9th Cir.1979); *Lafayette Beverage Distributors, Inc. v. Anheuser-Busch, Inc.,* 545 F.Supp. 1137, 1147 (N.D.Ind.1982). Moreover, a supplier clearly is entitled to terminate a customer which violates its

trademark rights or sells its product in a manner which creates a risk to its own reputation. *See, e.g., Clairol, Inc. v. Asaro,* 1975 Trade Cas. (CCH) ¶ 60,350 (E.D. Mich.1975); *Freed Oil Co. v. Quaker State Oil Refining Corp.,* 419 F.Supp. 479, 493–94 (W.D.Pa.1976), *vacated pursuant to settlement,* 1977–2 Trade Cas. ¶ 61,759 (1977).

### 3.

■ The demands of the counterclaiming defendants that By-Rite cease its sale of fountain products in bottles appear to have resulted from unilateral determinations by the respective managements of these companies. These determinations appear to have been grounded on legitimate and substantial concerns over By-Rite's actions. *See Impro Products, Inc. v. Herrick,* 1983–2 Trade Cas. (CCH) ¶ 65,540 (8th Cir. 1983); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 884–85 (9th Cir.1982); *cert. denied,* —— U.S. ——, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983); *Modern Home Institute v. Hartford Accident and Indemnity Co.,* 513 F.2d 102, 110 (2nd Cir.1975).

### 4.

■ By-Rite has made no effort to establish that any defendant has attempted to monopolize or has conspired to monopolize the retail soft drink market, as alleged in Count II of the Complaint. No evidence was presented to establish that any defendant has a "dangerous probability" of obtaining monopoly power in the relevant market, that any defendant has a "specific intent to monopolize" the retail sale of soft drinks in interstate commerce, or that any defendant has done any "act in furtherance of an attempt" to monopolize the alleged market. Each of these elements is essential to an attempt to monopolize claim. *See Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432 (10th Cir.1983). Likewise, By-Rite has not presented evidence demonstrating any conspiracy to monopolize or establishing the existence of any acts taken to further such a conspiracy. *Olsen, supra,* at 438.

**5.**

There is no likelihood that By-Rite will succeed on its claim that any defendant has discriminated against By-Rite in terms of price and delivery services. By-Rite has made no effort to establish that discriminatory prices or service terms were offered by any defendant to any party with whom By-Rite is in competition, as required under the Robinson-Patman Act. Certain defendants have never sold any product to By-Rite; and By-Rite now admits that Seven-Up never sold anything to By-Rite at a discriminatory price.

**6.**

With respect to those defendants who never have sold fountain syrup to By-Rite for use in the Carb-A-Drink system, the relief requested by By-Rite would alter and transform, rather than preserve, the *status quo.* Because the evidence before the Court establishes that By-Rite cannot meet the conventional requirements for preliminary injunctive relief, the Court need not reach and discuss the extraordinary showing which is necessary before the Court can grant mandatory preliminary injunctive relief which alters the *status quo.*

**7.**

For these reasons, By-Rite's motion for a preliminary injunction requiring the defendants to sell fountain syrups to By-Rite at particular prices is denied.

B. *The Counterclaiming Defendants' Motions for Preliminary Injunction and Action for Declaratory Judgment*

**8.**

The Coca-Cola Company, PepsiCo, and SSD have moved for preliminary injunctions (1) to prohibit By-Rite and its agents from selling in bottles or other containers intended for storage and later consumption, or encouraging or facilitating the sale in such containers of, soft drinks produced from these defendants' fountain syrups and (2) to prohibit By-Rite from using the trademarks of these defendants in connection with the sale of products produced from their fountain syrups in bottles or other containers, except for cups intended for reasonably immediate consumption. Seven-Up has prayed for a declaratory judgment that it has the right to impose on By-Rite the restriction that Seven-Up's fountain syrups be used only in containers designed for immediate consumption and not for bottling.

**9.**

The counterclaiming defendants are likely to succeed on the merits of their trademark claims under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and the Utah Trademark Act, Utah Code Ann. § 70–3–13 (1980), as well as their claims of unfair competition. Two of The Coca-Cola Company's trademarks—COCA–COLA and COKE—are "by common consent ... two of the most widely recognized trademarks in the world today." *The Coca-Cola Company v. Stewart,* 621 F.2d 287, 289 (8th Cir.1980). The trademarks of PepsiCo are also extremely well known and valuable. While SSD is a much newer company, the SUNKIST trademark has been used for over 30 years by Sunkist Growers, Inc. and the right to use the SUNKIST trademarks is an extremely valuable asset to SSD. By-Rite has failed to meet, and cannot meet, the quality control standards and product specifications established by the counterclaiming defendants for their bottled products. The evidence before the Court establishes that the bottled products sold by By-Rite are not the same as the products of authorized bottlers. Further, By-Rite's activities create a substantial likelihood of confusion as to the quality of By-Rite's products and the sponsorship of said products by the counterclaiming defendants. Similar activities as those engaged in by By-Rite have prompted other courts to conclude that there is a likelihood of success on trademark and unfair competition claims, and to issue injunctions. *See Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131 (D.Colo.1980); *The Coca-Cola Company v. J.G. Butler & Sons,* 229 F. 224 (8 Cir. E.D.Ark.1916); *The Coca-Cola Co. v. Ben-*

*nett,* 238 F. 513 (8th Cir.1916). In *Coors,* the court found that a failure of an unauthorized distributor to comply with the quality control standards of a manufacturer could constitute trademark infringement, use of false designation or representation under § 43(a) of the Lanham Act, and unfair competition, and accordingly issued an injunction prohibiting the activities. *See also Clairol, Inc. v. Boston Discount Center of Berkley, Inc.,* 608 F.2d 1114, 1120 (6th Cir.1979); *J.C. Penney Co. v. Parrish Co.,* 339 F.Supp. 726 (D.Idaho 1972).

## 10.

■ The sale of the counterclaiming defendants' products in bottles bearing the CARB–A–DRINK trademark constitutes a separate trademark violation sometimes termed "reverse passing off." *See Smith v. Montoro,* 648 F.2d 602 (9th Cir.1981); *cf. Arrow United Industries v. Hugh Richards, Inc.,* 678 F.2d 410 (2d Cir.1982); *see also Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980) (trademark law is concerned with deception of prospective customers as well as present purchasers); *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.,* 221 F.2d 464, 466 (2d Cir. 1955); *Koppers Co. v. Krupp-Koppers GmbH,* 517 F.Supp. 836, 843–44 (W.D.Pa. 1981); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 355 F.Supp. 365, 370 (S.D.N.Y. 1972); Callman, *Unfair Competition, Trademarks and Monopolies,* § 84.1(b) (3rd ed. supp. 1982) ("postsale confusion of individuals other than the purchaser is a legitimate basis for a finding of liability ... in reverse passing off cases"). Although purchasers at a Carb-A-Drink fountain will believe that they are buying the counterclaiming defendants' products because they can see the trademarks on the fountain heads, other users who later drink these beverages at home, at picnics or elsewhere, will see only the CARB–A–DRINK trademark on the bottle, and they may be led to believe that it is a CARB–A–DRINK product. To the extent that they are satisfied with the product, only Carb-A-Drink will benefit.

## 11.

■ The counterclaiming defendants will suffer irreparable harm in the absence of a preliminary injunction. There are few things in our commercial life more valuable than a company's reputation, goodwill, and trademarks. All of the counterclaiming defendants have pursued a program of quality control for their products and have spent huge sums to protect the trademarks and their reputation. By-Rite's sale of bottled products through the Carb-A-Drink system will cause confusion as to the quality and sponsorship of the products sold and will damage the counterclaiming defendants' goodwill and reputation for high quality products. A number of courts have held that such damage is, in itself, irreparable injury sufficient to support an injunction. *See, e.g., Helene Curtis Industries v. Church & Dwight Co.,* 560 F.2d 1325, 1332 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *Cyclonaire Corp. v. United States Systems, Inc.,* 209 U.S.P.Q. 310, 316 (D.Kan.1980); *Burger Chef Systems, Inc. v. MPG, Inc.,* 530 F.Supp. 1, 2 (N.D.Okl.1979); *Miller Brewing Co. v. Carling O'Keefe Breweries,* 452 F.Supp. 429, 437 (W.D.N.Y.1978). Moreover, such injury is generally considered irreparable because of the extreme difficulty of receiving adequate compensation through damages. *See Omega Importing Corp. v. Petri-Kline Camera Co.,* 451 F.2d 1190, 1195 (2nd Cir.1971); *The Coca Cola Company v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1190 (E.D.N.Y. 1972).

## 12.

■ The public interest favors granting a preliminary injunction against By-Rite. The counterclaiming defendants are seeking a preliminary injunction to avoid confusion and deception of the public as a result of By-Rite's actions which reduce the value of their trademarks. *See Budget System, Inc. v. Budget Loan & Finance Plan,* 12

Utah 2d 18, 361 P.2d 512, 514 (1961). While the injunction will prevent the sale of the counterclaiming defendants' products in bottles or other containers intended for storage and later consumption which may be at lower prices through the Carb-A-Drink system, a not insignificant concern, the Court concludes that, in the long run, the public interest is better served by the public's being assured of the quality of bottled products sold under the counterclaiming defendants' trademarks.

13.

A preliminary injunction will not cause any irreparable harm to By-Rite. Whatever damage By-Rite may suffer if it ultimately were to prevail could be adequately compensated by monetary judgment. Moreover, the injunction will only prevent By-Rite from selling in bottles soft drinks mixed from the counterclaiming defendants' fountain syrups and from using their trademarks in connection with such sales in bottles. By-Rite remains free to sell products in cups and remains free to sell products of non-objecting manufacturers in bottles.

14.

For the reasons set forth above, the Motions for Preliminary Injunction of The Coca-Cola Company, PepsiCo and SSD are hereby granted. Declaratory Judgment is entered in Seven-Up's favor granting it the right to impose the field-of-use restriction which it desires, namely, limiting the use of its fountain syrups to the mixing and dispensing of its products into sanitary, single-use containers designed for immediate consumption.